793 So.2d 738 (2000)
AMERICAN GENERAL FINANCE, INC., et al.
v.
Mable BRANCH.
American General Finance, Inc.
v.
April Reaves.
1990887 and 1990888.
Supreme Court of Alabama.
December 22, 2000.
Concurring Opinion on Denial of Rehearing March 30, 2001.
*740 Robert H. Rutherford, Richard C. Keller, and F.A. Flowers III of Burr & Forman, L.L.P., Birmingham, for appellants.
Garve W. Ivy, Jr., of Ivey & Ragsdale, Jasper, for appellees.
Robert A. Huffaker of Rushton, Stakely, Johnston & Garrett, P.A., Montgomery, for amicus curiae Automobile Dealers Association of Alabama, in support of the appellants' application for rehearing.
Matthew C. McDonald of Miller, Hamilton, Snider & Odom, L.L.C., Mobile, for amici curiae Alabama Retail Association and Alabama Civil Justice Reform Committee, in support of the appellants' application for rehearing.
H. Hampton Boles and Michael L. Edwards of Balch & Bingham, L.L.P., Birmingham, for amicus curiae Alabama Bankers Association, in support of the appellants' application for rehearing.
COOK, Justice.
American General Finance, Inc. ("American General"); Merit Life Insurance Co. ("Merit"); and Yosemite Insurance Company ("Yosemite") (collectively "the Lenders") appeal from an order denying their motions to compel the arbitration of claims presented in an action commenced by Mable Branch (appeal no. 1990887) and an order denying their motions to compel the arbitration of claims presented in an action commenced by April Reaves (appeal no. 1990888). We affirm as to case 1990887, but as to case 1990888 we reverse and remand.
The claims of Branch and Reaves arose out of a series of loan transactions in which they separately borrowed money from American General. In Reaves's case, the first transaction occurred in December 1994, and the second on November 2, 1995. In Branch's case, the first transaction occurred on July 3, 1996; a second on October 18, 1996; and a third on November 21, 1997.
The "Note and Security Agreement" signed by Branch on November 21, 1997, contained the following pertinent provisions:
"Borrower(s) hereby acknowledge that the transactions evidenced by this agreement involve interstate commerce. Borrower and Lender agree that, except as otherwise set forth in this provision, all claims, disputes, or controversies of every kind and nature between Borrower(s) and Lender shall be resolved by arbitration, including (i) those based on contract, tort or statute, (ii) those arising out of or relating to the transaction(s) evidenced by this agreement, the disclosures relating to this agreement, the Federal Disclosure Statement, any insurance certificates or policies, any documents executed at or about the same time this agreement was executed or (iii) those arising out of, relating to any other prior, proposed or actual loan or extension of credit, (and the relationships which result from these transactions or any other previous transactions between Borrower(s) and Lender). Borrower(s) and Lender further agree that all issues and disputes as to the arbitrability of claims must also be resolved by the arbitrator.
". . . .
"Arbitration of such claims will be conducted by a single arbitrator selected by the Borrower(s) and Lender, pursuant to the Federal Arbitration Act, [9 U.S.C. § 1 et seq. (the "FAA"),] and according to the commercial rules of the American Arbitration Association, at a reasonable and convenient location to be selected by the Borrower(s). Each party shall pay one-half of the arbitration costs and expenses.

*741 ". . . .
"BORROWER(S) AND LENDER AGREE THAT THE ARBITRATOR MAY AWARD PUNITIVE DAMAGES ONLY UNDER CIRCUMSTANCES WHERE A COURT OF COMPETENT JURISDICTION COULD AWARD SUCH DAMAGES. HOWEVER, IN NO EVENT SHALL AN AWARD OF DAMAGES EXCEED FIVE (5) TIMES THE ECONOMIC LOSS SUFFERED BY THE PARTY. BORROWER(S) AND LENDER FURTHER AGREE THAT THE ARBITRATOR SHALL NOT CONDUCT ANY CLASS-WIDE PROCEEDINGS AND WILL BE RESTRICTED TO RESOLVING THE INDIVIDUAL DISPUTES BETWEEN THE PARTIES."
"Borrower(s) and Lender agree that, notwithstanding the foregoing, Lender retains the right to use judicial or self-help remedies (i) to repossess or foreclose on collateral or to enforce the security interests relating to this transaction, and (ii) to pursue collection actions against the Borrower(s) where the amount of the debt is $10,000 or less. The exercise of this right by Lender to pursue judicial or self-help remedies shall not constitute a waiver of Lender's right to compel the arbitration of any claim or dispute subject to this arbitration clauseincluding the filing of a counterclaim by Borrower(s) in a lawsuit filed by Lender.
"The arbitration clause shall be binding upon the assigns, directors, officers, representatives, employees, parent companies, affiliated companies, subsidiaries and successors of Lender, and the administrators, assigns, executors, heirs and representatives of Borrower(s). In addition, the parties agree to submit to arbitration not only the foregoing claims or disputes against each other, but also all claims or disputes they have against (i) all other persons or entities involved with the transactions subject to this clause, (ii) all persons or entities who signed or executed any of the documentation subject to this clause, and (iii) all persons or entities who may be jointly or severally liable to any of the parties to this agreement regarding matters or events relating to the transactions and documentation subject to this clause."
(Boldface type and capitalization in original.)
The "Note and Security Agreement" executed by Reaves on November 2, 1995, contained arbitration provisions that differed from the ones in Branch's contract in only one material respect. That agreement did not contain the provision purporting to make arbitrable "all issues and disputes as to the arbitrability of claims." (Boldface type omitted.)
Branch and Reaves commenced their actions on June 15, 1998, and September 11, 1998, respectively. Branch sued Merit and Yosemite, as well as American General, while Reaves sued only American General. Broadly stated, the substantive allegations common to both complaints were that the plaintiffs were enticed, pursuant to a scheme or plan, to borrow money under circumstances that enabled the defendants (1) to collect excessive finance charges; (2) to sell customers "duplicative services" through "flipping"[1]; and (3) to collect unnecessary or excessive premiums for credit-disability insurance and life insurance.
*742 All defendants moved to compel arbitration of the actions, based on the arbitration provisions in the "Note and Security Agreement" documents. In a written order, the trial court denied the motions on the ground that the arbitration provisions were unconscionable. The order stated in pertinent part:
"This matter comes before the court on the motions of the defendants [American General, Merit, and Yosemite], to compel the disputes of the plaintiffs to arbitration in Branch and the same motion on behalf of [American General] in Reaves.

"The parties have, pursuant to this court's order conducted extensive discovery on the issues, and have submitted voluminous filings to support the record on their respective positions. Along with the Branch case, they have simultaneously done discovery in the [Reaves case].
"Because the issues in Branch and Reaves are the same as to [American General], they will be addressed together. The issues in Branch as to [Merit and Yosemite] are much less complex and can be disposed of summarily, and they will, therefore, be addressed first.
"It is indisputable that both Merit and Yosemite rely upon the provisions of the retail installment contract in the American General document. The broad arbitration provision in this case clearly may be read to encompass the subsidiaries of American General, in this case, Merit and Yosemite. Therefore, to the extent that Merit and Yosemite move to compel arbitration, the findings of this court as to American General appl[y] equally to them, and they will be bound to these findings.
"The court's first duty in considering whether to grant the motion of the defendants is to determine whether or not the parties agreed to arbitrate. The breadth of the clause is not at issue until that determination is made.
"Facially, the parties have signed the contracts in question. That fact, in and of itself, is not dispositive, however, for as our Supreme Court, the Supreme Court of the United States, and the Federal Arbitration Act itself[ ] all say[,] [written] contracts requiring arbitration are subject to the defenses available under state law that would be available to resist any contract.
"Many of the defenses that are implicit in the evidence before the court would require this court, applying the summary judgment standard enunciated by our Supreme Court, to submit these issues for trial to a jury, as there are many questions of fact that could invalidate this provision if a jury believed the evidence and position argued by the plaintiffs.
"There are, however, contract defenses that are to be considered by the court. The Supreme Court of Alabama, in Green Tree Financial Corp. of Alabama v. Vintson, [753 So.2d 497 (Ala. 1999)], noted that the defense of unconscionability is for the trial court....
"The doctrine of unconscionability is codified in [Ala.Code 1975, § 5-19-16, which provides:
"`With respect to a consumer credit transaction, if the court as a matter of law finds the contract or any provision of the contract to have been unconscionable at the time it was made, the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable provision, or it may so limit the application of any unconscionable provision as to avoid any unconscionable result.]'
". . . .

*743 "Our [Supreme Court] has enumerated a series of factors appropriate for consideration of a clause purporting to require arbitration when evaluating it for unconscionability.
"The Alabama Supreme Court has noted:
"`Although Alabama law lacks an explicit standard for determining whether a contract or contractual provision is unconscionable, case law reveals that four factors are important in making this determination.
"`In addition to finding that one party was unsophisticated and/or uneducated, a court should ask (1) whether there was an absence of meaningful choice on one party's part, (2) whether the contractual terms are unreasonably favorable to one party, (3) whether there was unequal bargaining power among the parties, and (4) whether there were oppressive, one-sided, or patently unfair terms in the contract.'
"Layne v. Garner, 612 So.2d 404, 408 (Ala.1992).
"Further, in Wilson v. World Omni Leasing, Inc., 540 So.2d 713 (Ala.1989), the Supreme Court observed:
"`Comment (1) of the official comments to § 7-2-302 sets out the basic test to determine unconscionability:
"`"[W]hether, in the light of the general commercial background and the commercial needs of the particular trade or case, the clauses involved are so one-sided as to be unconscionable under the circumstances existing at the time of the making of the contract.... The principle is one of the prevention of oppression and surprise ... and not of disturbance of allocation of risks because of superior bargaining power."
The intention of this section is to allow the courts to pass directly on the unconscionability of the contract or the particular clause therein and to make a determination as to its unconscionability. Id. It is within the court's discretion to refuse to enforce the contract as a whole if it is permeated by unconscionability, or to strike any single clause or group of clauses that are so tainted or that are contrary to the essential purpose of the agreement, or to simply limit the unconscionable clause so as to avoid unconscionable results.'
540 So.2d at 716. See also Williams v. E.F. Hutton Mortgage Corp., 555 So.2d 158 (Ala.1989); Crestline Ctr. v. Hinton, 567 So.2d 393 (Ala.Civ.App.1990); Marshall v. Mercury Fin. Co., 550 So.2d 1026 (Ala.Civ.App.1989); Advertiser Co. v. Electronic Eng'rs, Inc., 527 So.2d 1317 (Ala.Civ.App.1988).
"The issue of unconscionability is a question of law for the court and the party claiming unconscionability bears the burden of proof. See, e.g., Green Tree Fin. Corp. of Alabama v. Vintson, [753 So.2d 497 (Ala.1999)].
"As another example, in Ex parte Dan Tucker Auto Sales, Inc., 718 So.2d 33 (Ala.1998), Justice Lyons, in his concurring opinion, wrote:
"`Alabama has long recognized the doctrine of unconscionability as a defense to enforcement of a contract. While Prima Paint Corp. v. Flood & Conklin Mfg. Co., 388 U.S. 395, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967), relegates challenges to the validity of the contract as a whole to the arbitrator, a challenge to the arbitration clause only is properly determined by the court.
"`... [U]nconscionability, under general principles of Alabama law, can *744 be reduced to a four-part test: (1) whether there is an absence of meaningful choice on one party's part; (2) whether the contractual terms are unreasonably unfavorable to one party; (3) whether there was unequal bargaining power between the parties; and (4) whether the contract contained oppressive, one-sided, or patently unfair terms.
"`I believe that a showing of financial hardship, lack of choice, and one-sidedness could, in a proper case, lead to a finding of unconscionability and a concomitant holding of unenforceability of an arbitration agreement that would not conflict with governing federal law.'
"718 So.2d at 43. [(Citations omitted.)]
"Later, in Ex parte Napier, 723 So.2d 49 (Ala.1998), the Court noted that:
"`[M]atters that could be germane to a determination of unconscionability, [include] a refusal of [the plaintiff's] request for assistance after she had notified someone that she was unable to see or to understand [the arbitration clause]; [the plaintiff's] inability to obtain the product made the basis of this action from this seller, or from another source, without having to sign an arbitration clause; the oppressiveness or unfairness of the mechanism of arbitration; or the [unfairness] of a discount or other quid pro quo in exchange for [the plaintiff's] accepting an arbitration agreement.'
"723 So.2d at 52.
"Additional factors have been added in later cases. For example, in Ex parte Parker, 730 So.2d 168 [,171] (Ala.1999), the Court observed that `lack of mutuality of remedy can be one factor, along with others, that a court may consider in determining whether an arbitration clause is unconscionable.' See also Brilliant Homes, Ltd. v. Lind, 722 So.2d 753, [755] (Ala.1998) (Lyons, J., concurring) (Arbitration clause that gives arbitrator power to determine its own authority `may itself be an indicium of unconscionability.').
"Considering this guidance, the court has found this arbitration provision to be unconscionable as a matter of law.
". . . .
"Considering the factors discussed by Justice Lyons in Dan Tucker, the court finds the following:
"1. As to an absence of meaningful choice, this case presents a complete record wherein it is indisputable that there was no meaningful [emphasis in original] choice in the matter. American General has answered written discovery, including requests for admissions wherein they admit that (admittedly, reluctantly). There are stipulations from the other finance companies who are available in this market to administer these sorts of loans, and it is clear that Norwest [Financial Alabama, Inc.], Tran-South [Financial Corporation], [and] AVCO [Financial Services of Alabama, Inc.], all require a consumer, knowingly or unknowingly, to execute an arbitration provision as a prerequisite to loaning the consumer the money.
"As supported by the testimony, these finance companies compete for the same market, and Branch and Reaves, typical customers, are not customers who would go to a bank for loans of this sort.

"2. It is abundantly clear that the contractual terms are unreasonably favorable to the defendants. The defendant makes a tacit admission of this by purporting to abdicate some of the most offensive terms.
"For example, the defendants stipulated to give the arbitrator the power to award costs and attorney fees to the *745 prevailing party; they stipulated to allow the arbitrator to impose injunctive relief; they stipulated that they, the defendants, would pay the filing fees; they stipulated that the arbitrator could award an unlimited amount of compensatory damages.
"The court finds this series of stipulations to be very curious. Surely, the defendants do not purport to now unilaterally modify the written contract upon which they rely. For the defendants to even suggest this supports the very proposition that they, the defendants, are in a superior position, and that the relative positions of the parties are unequal.
"In point of fact, this is an adhesion contract, designed and drafted by the defendants, and as bad as that may be, it is worse that they purport to unilaterally fix what is clearly wrong with it.
". . . .
"The punitive damages available to the plaintiff are limited to five times the economic damages. The Supreme Court of the United States has declined to adopt an arithmetic formula; the Supreme Court of Alabama has declined to adopt an arithmetic formula; our legislature has adopted a tort reform package which rejected this approach. Surely, a large corporate defendant cannot impose these terms.

"Additionally, the contract purports to allow the defendant to use the court system to collect amounts up to $10,000.00, which, according to the testimony in this case, would include most of their loans. The court is aware that our Supreme Court has rejected lack of mutuality as a basis for denying arbitration. However, the lack of mutuality is appropriate for this court to consider in evaluating the basic fairness of this agreement.
"Alabama statutory and common law [in]vest this court with the power to `... refuse to enforce the contract, or [to] enforce the remainder of the contract without the unconscionable clause, or [to] so limit the application of any unconscionable clause so as to avoid any unconscionable result.'
"Accordingly, the court finds that the provisions of the subject contracts which purport to require arbitration of the disputes arising out of these contracts are unconscionable as a matter of law."
(Emphasis added except where noted.)
From this order, the defendants appeal. The appeals present these issues: (1) whether the FAA applies to the contracts; (2) whether a contract may remove from the judiciary the right to decide the threshold issue of unconscionability; and (3) whether, under these facts, the arbitration provision in either contract, or both contracts, is unconscionable.

I. Applicability of the FAA Interstate Commerce
The FAA applies only (1) if there is a "written agreement calling for arbitration," Prudential Sec., Inc. v. Micro-Fab, Inc., 689 So.2d 829, 832 (Ala.1997); and (2) if the contract containing the arbitration provision "substantially affects interstate commerce." Sisters of the Visitation v. Cochran Plastering Co., 775 So.2d 759, 766 (Ala.2000). Relying on Sisters, Branch and Reaves contend that their contracts do not affect interstate commerce sufficiently to invoke the applicability of the FAA. We disagree.
Sisters involved a contract between the Sisters of the Visitation, operators of a "monastery and spiritual retreat in Mobile," and Cochran Plastering Company, Inc. ("Cochran"), an Alabama corporation. Id. at 760. The contract required Cochran to "repair cracks in the plaster in the *746 ceilings and wall of the chapel, to cast and install plaster moldings, and to pin up all loose moldings with screws and washers." Id. at 760.
The Sisters commenced arbitration proceedings on the basis of an arbitration clause in the contract. Cochran sought to enjoin the arbitration proceedings, arguing, among other things, that the transaction did not have a nexus with interstate commerce sufficient to invoke the FAA. This Court agreed with Cochran, holding that the contract did not "substantially affect[ ] interstate commerce." Id. at 766.
In so holding, we explained:
"The Sisters of the Visitation and Cochran are both Alabama residents, and the contract was to be performed in Alabama. The only affiliation of any of the parties with out-of-state entities is found in the relationship between the Sisters and the Roman Catholic Church. We are simply not prepared to recognize that relationship as commercial activity in interstate commerce, analogous to the network of Terminix franchises across the country. See [Allied-Bruce Terminix Companies v. Dobson, 513 U.S. 265, 282, 115 S.Ct. 834, 130 L.Ed.2d 753 (1995)]."
Id. at 765.
Regarding Cochran's use of "tools and equipment," we said:
"One must assume that Cochran brought tools and equipment to the project site, but the record is silent as to whether they were leased or purchased specially for the project and, if so, whether they had moved in interstate commerce.... No substantial effect on interstate commerce can be developed based on Cochran's acquiring in interstate commerce any tool and equipment to be used in the performance of this contract."
Id. at 766.
Discussing the "services and materials" required by the contract, we said:
"We have no indication that Cochran employed out-of-state workers, so we assume that its workers were local. The contract apparently specified the use of plaster and washers that were required to be obtained from outside the State, and it called for insurance, which was obtained from an insurance company from outside the State. However, the record provides no information from which we can determine what portion of the amount the Sisters paid Cochran is allocable to the cost of local labor and overhead and what portion is allocable to materials or services specially purchased for use or consumption in performance of the contract."
Id. at 766. Also, we noted that "the object of the services provided by Cochran," that is, the chapel and its repairs, was "incapable of subsequent movement across state lines or of otherwise having a subsequent substantial effect on interstate commerce." Id. at 765.
Finally, we considered the extent to which the contract was connected with, or implicated, other contractual relationships. In that connection, we said:
"Cochran's contract is related to several other contracts, apparently also made directly with the Sisters, including a contract with the architect for the chapel project; contracts with workers in the various trades whose work was called for in the foregoing description of the scope of the work; and a contract with the Texas resident who prepared the specifications for the plaster work. The fact that several of the related contracts have a substantial effect on interstate *747 commerce cannot be seriously disputed."
Id. at 766-67 (emphasis added). We focused on the effect the subject contract would "in fact have on those other contracts." Id. at 767 (emphasis added). There was no evidenceor contention that the related contracts would be "disrupt[ed]," by "delays or distraction" associated with litigation. Id. at 767. We concluded that the FAA was inapplicable.
In this case, however, Branch and Reaves concede that American General was incorporated in Alabama by American General, Inc., "a large, multi-national corporation," for the purpose of doing business in Alabama. Brief of Appellee Branch, at 9 n. 1; Brief of Appellee Reaves, at 8 n. 1. The headquarters of American General, Inc., are in Indiana. Affidavit testimony in the record indicates that "the money which [American General] provides as loans to its customers is made available to [American General] through an affiliated corporation, American General Finance Corporation ("AGFC"), an Indiana corporation also headquartered in Indiana." (Clerk's Record in Case 1990888, at 76.) "The money is sent to [American General] ... from AGFC's bank account located outside Alabama, and when payments are made by customers to [American General], those funds are ultimately sent out of state to AGFC's bank accounts as repayment of the funds previously furnished to [American General]." Id.
Merit, through which American General allegedly sold credit-life insurance to Branch, is an Indiana corporation headquartered in Indiana. Id. at 74. Yosemite, through which American General sold credit-disability and credit-property insurance to Branch, is incorporated in California and headquartered in Indiana. Id. at 75. "Some of the employees who work at the [American General] branch offices are also licensed agents of Merit and Yosemite." Id. When a customer purchases credit insurance in connection with a loan from American General, he or she "is issued a certificate of insurance from either Merit or Yosemite, which certificate had been previously sent to the American General offices in Alabama." Id. "Information about each customer is gathered in the Alabama branch offices and then transmitted to Merit's or Yosemite's headquarters in Indiana, where it is stored in a computer data base." Id. Indeed, the corporate relationships involved here generate precisely the complex interstate commercial activity that we expressly noted was absent in Sisters.
These cases are also diametrically opposed to Sisters in that there, "the object of the services"the chapel and its repairs was "incapable of subsequent movement across state lines or of otherwise having a subsequent substantial effect on interstate commerce." 775 So.2d at 765. Here, the object of the transactionthe loan proceedswas intrinsically mobile. In other words, the proceeds enabled Branch and Reaves subsequently to purchase goods and services that traveled in interstate commerce.
We need not belabor the issue to conclude that these transactions substantially affected interstate commerce. See Staples v. Money Tree, Inc., 936 F.Supp. 856, 858 (M.D.Ala.1996) (loan transaction negotiated in Alabama involved interstate commerce where the lender was a Georgia corporation; loan proceeds were "wired from Georgia and then disbursed ... in Alabama; all supplies for the Alabama Money Tree office were shipped from Georgia; and all loan documents were printed in Georgia"). Indeed, Branch and Reaves have cited no case holding that loan transactions resembling those involved *748 here did not affect interstate commerce for purposes of the FAA. Consequently, we conclude that these contracts invoke the FAA.

II. Unconscionability
A threshold question in the discussion of whether these arbitration agreements were unconscionable is whether that determination is to be made by the court or by the arbitrator. The arbitration clause in Branch's contract purports to stipulate that the arbitrator is to decide the threshold issues of arbitrability, such as whether the arbitration clause itself is unconscionable. Of course, that is the defendants' position.

A. Who Decides?
Nevertheless, "a determination that, by the terms of the arbitration clause, the arbitrator is to decide issues of arbitrability does not end the inquiry." Green Tree Fin. Corp. v. Wampler, 749 So.2d 409, 413 (Ala.1999). "Where the attack is addressed to the arbitration clause itself, as opposed to the contract as a whole, the court, and not the arbitrator, resolves the issue." Id. Thus, the threshold "issue of unconscionability of an arbitration clause is a question for the court and not the arbitrator." Id. at 415 (emphasis added). See also Ex parte Napier, 723 So.2d 49 (Ala.1998); Ex parte Dan Tucker Auto Sales, Inc., 718 So.2d 33, 41 (Ala.1998) (Lyons, J., concurring specially).
Branch and Reaves contend that the arbitration clauses were, themselves, unconscionable. Indeed, that was the only question addressed by the trial court, and that is the only substantive issue before this Court. The trial court did not err, therefore, in holding that it would determine whether the arbitration clauses are unconscionable. Thus, we shall proceed to consider whether the trial court erred in concluding that the clauses were unconscionable as to both Branch and Reaves.

B. Branch's Contract
The trial court's order sets out in general terms the conditions under which a contract may be held to be unconscionable. More specifically, it discussed and applied the Layne v. Garner factors, namely: "(1) whether there was an absence of meaningful choice on one party's part, (2) whether the contractual terms are unreasonably favorable to one party, (3) whether there was unequal bargaining power among the parties, and (4) whether there were oppressive, one-sided or patently unfair terms in the contract." 612 So.2d at 408. For ease of discussion, we can reduce the Layne v. Garner test further to one comprised of two essential elements: (1) terms that are grossly favorable to a party that has (2) overwhelming bargaining power. Where these elements are present, Alabama courts will intervene under the guidance of § 5-19-16. Applying these factors, we conclude that the arbitration clause in Branch's contract is unconscionable.

(1) Grossly Favorable Terms
The first indicium of unconscionability is the breadth of the clause. The arbitration provision in Branch's contract is unusually broad in scope and application. It applies to every "dispute[ ] or controversy[ ] ... relating to" every actual or potential transactionwhether past, present, or future and to every person, whether signatory or nonsignatory to any document, involved in such a transaction between the parties. (Emphasis added.) Thus, it applies to every cause of action that could conceivably arise in favor of Branch, and to every individual against whom a claim could conceivably be brought. This Court has often recognized that the phrase "relating to" is one of the broadest of the coverage provisions. Beaver Constr. Co. v. Lakehouse, L.L.C., 742 So.2d 159, 165 (Ala. *749 1999); Green Tree Fin. Corp. of Alabama v. Vintson, 753 So.2d 497 (Ala.1999); Kenworth of Dothan, Inc. v. Bruner-Wells Trucking, Inc., 745 So.2d 271 (Ala.1999); Ex parte Conference America, Inc., 713 So.2d 953 (Ala.1998); Reynolds & Reynolds Co. v. King Autos., Inc., 689 So.2d 1 (Ala.1996); Ex parte Gates, 675 So.2d 371 (Ala.1996); Old Republic Ins. Co. v. Lanier, 644 So.2d 1258 (Ala.1994).
A second indicium of unconscionability is the provision purporting to invest the arbitrator with the threshold issues of arbitrability. "Such authority of the arbitrator to determine its own authority may itself be an indicium of unconscionability." Brilliant Homes, Ltd. v. Lind, 722 So.2d 753, 755 (Ala.1998) (Lyons, J., concurring in the result).
A third indicium is the provision exempting the Lenders from the duty to arbitrate and expressly reserving for them the right to try to a jury their claims against Branch up to $10,000. Practically speaking, this provision benefits only the Lenders. In other words, American General reserved for itself the right to collect by judicial action the loan paymentsthe only species of claim it would ever realistically be expected to assert against Branchwhile requiring Branch to settle by arbitration claims such as breach of contract and fraudthe species of claims she would most likely assert against the Lenders.
More than once, this Court has expressed concern about such provisions. In Northcom, Ltd. v. James, 694 So.2d 1329 (Ala.1997), two Justices stated in the main opinion:
"[I]n a case involving a contract of adhesion, if it is not shown that the party in an inferior bargaining position had a meaningful choice of agreeing to arbitration or not, and if the superior party has reserved to itself the choice of arbitration or litigation, a court may deny the superior party's motion to compel arbitration based on the doctrines of mutuality of remedy and unconscionability."
Id. at 1338. In Ex parte McNaughton, 728 So.2d 592 (Ala.1998), cert. denied sub nom. McNaughton v. United Healthcare Servs., Inc., 528 U.S. 818, 120 S.Ct. 59, 145 L.Ed.2d 52 (1999), we disapproved that rationale; however, in Ex parte Parker, 730 So.2d 168, 171 (Ala.1999), we said: "The Parkers' argument has merit to the extent that the lack of mutuality of remedy can be one factor, along with others, that a court may consider in determining whether an arbitration clause is unconscionable." Thus, the absence of mutuality of remedy is still relevant in an unconscionability analysis. See Green Tree Fin. Corp. v. Wampler, 749 So.2d 409, 416 (Ala.1999) ("while the agreement restricts the Wamplers to arbitration while reserving to Green Tree the option to litigate, this fact, standing alone, is not sufficient to warrant a finding of unconscionability").
This provision is particularly significant in view of the companion provision purporting to limit the right of the arbitrator to award an amount "exceed[ing] five times the amount of economic loss." (Emphasis added.) This limitation includes not only punitive damages, but all species of noneconomic loss, such as mental anguish. It goes without saying that such damages may be recovered in litigation. Under these contracts, the arbitrator "cannot award the full panoply of relief available in state courts under Alabama law." Roberson v. Money Tree of Alabama, Inc., 954 F.Supp. 1519, 1526 (M.D.Ala.1997).
Although the Roberson court held that the arbitration provision at issue was not unconscionable, it expressly noted that the contract did not limit the amount recoverable in arbitration. Id. Significantly, it further stated: "The court therefore does not *750 have before it whether a contract that not only requires the borrower to arbitrate any claim, while reserving for the lender the right to seek judicial remedies in the eventuality of default, but also restricts the borrower's range of relief in arbitration, is unconscionable." Id. n. 8 (emphasis added). See also Wampler, 749 So.2d at 415 (one indicium of unconscionability is the "oppressiveness or unfairness of the mechanism of arbitration").
That, of course, is this case. It is one in which the Lenders have reserved for themselves the right to full redress for their claims, but denied that right to Branch. In other words, the contract limits not only the right to a specific forum, but the right to a remedy itself.
In that respect, this case differs fundamentally from others in which we have upheld clauses reserving for one party the right to litigate, but restricting the other party to arbitration. For example, in Napier, supra, the pertinent provision stated: "The parties agree and understand that the arbitrator shall have all powers provided by the law and the Contract. These powers shall include all legal and equitable remedies including, but not limited to, money damages, declaratory relief and injunctive relief." 723 So.2d at 51 (emphasis added). See also Ex parte Parker, 730 So.2d at 170 (functionally identical provision); Green Tree Fin. Corp. v. Vintson, 753 So.2d 497, 500 (same); Ex parte Smith, 736 So.2d 604 (Ala.1999) (same).
In short, the arbitration provisions in this contract are so grossly favorable to the Lenders as to pass the first prong of the simplified Layne v. Garner test.[2] Thus, it remains only to be determined whether Branch had any meaningful choice.

(2) Overwhelming Bargaining Power
A primary indicium of unconscionability in the modern consumer-transaction context is whether the consumer has the ability "to obtain the product made the basis of [the] action" without signing an arbitration clause. Wampler, 749 So.2d at 415. In this connection, Branch testified by affidavit:
"All of the documents and forms I signed which were used in borrowing the money in question were provided to me by American General Finance, Inc. I did not provide any of them, I did not have any input into them, and I did not have any choice about what documents to sign if I wanted to borrow the money. I was told that in order to borrow the money I had to sign all the paperwork where they showed me."
Moreover, the record contains evidence indicating that when Branch acquired her loans from American General on July 3, 1996; October 18, 1996; and November 21, 1997, the market was virtually closed to consumers seeking comparable financing without agreeing to arbitration provisions.
The record contains stipulations and affidavit testimony of 8 of the 16 companies (the 8 including American General) that were listed in the advertising pages of the Southern Directory Company telephone directory for the City of Tuscaloosa under the heading "Financing."[3] The other seven *751 companies are Associates Financial Services Company of Alabama, Inc.; Tran-South Financial Corporation; AVCO Financial Services of Alabama, Inc.; First Family Financial Services, Inc.; City Finance Company of Alabama, Inc.; Norwest Financial Alabama, Inc.; and Household Finance Corporation of Alabama. Of these companies, only Household Finance Corporation of Alabama "did not routinely enter into arbitration agreements in connection with its loans during the 1994-97 time frame." Norwest Financial Alabama, Inc., and AVCO Financial Services of Alabama, Inc., began requiring loan applicants to sign arbitration agreements in August 1995. Associates Financial Services Company of Alabama, Inc.; Tran-South Financial Corporation; and First Family Financial Services, Inc., began requiring loan applicants to sign arbitration agreements in May 1996. City Finance Company of Alabama, Inc., began requiring loan applicants to sign arbitration agreements in October 1996.[4]
Thus, when Branch applied for her November 21, 1997, loan, only one of the entities, namely, Household Finance Corporation of Alabama, did not require loan applicants to agree to arbitrate. Indeed, when she applied to American General for her first loan on July 3, only two of the companies, namely, Household Finance Corporation of Alabama, and City Finance Company of Alabama, Inc., did not require arbitration agreements.
We note that "[e]ntire segments of the market for certain goods and services ... are being closed to consumers who are unwilling to forfeit the rights guaranteed them by the federal and state constitutions." Allstar Homes, Inc. v. Waters, 711 So.2d 924, 933 (Ala.1997) (Cook, J., concurring specially), rejected on other grounds, Ex parte Perry, 744 So.2d 859 (Ala.1999). In order to meet her burden of proof on this issue, a consumer need not show that the market was completely closed, only that she was unable to acquire goods or services without considerable expenditure of time and resources. Branch has made such a showing in this case. From the sample responses of the companies providing the kind of financing for which Branch was shopping in her geographical area, it follows that only 1 or 2 companies out of 16 might have allowed her to borrow money in November 1997 without agreeing to arbitrate. Branch would have had to expend considerable time and effort even to find these companies. Because the evidence demonstrates that Branch had no meaningful choice, the second Layne v. Garner factor is satisfied.
For these reasons, we conclude that the trial court did not err in holding the arbitration provisions in Branch's contract to be unconscionable and unenforceable. The order in case 1990887 is affirmed.

C. Reaves's Contract
The foregoing analysis as to Branch's case would seem to require a similar result in Reaves's case. Unlike Branch, however, Reaves cannot demonstrate that she was unable to acquire goods or services without considerable expenditure of time and resources. This is so because Reaves obtained her last loan from American General on November 2, 1995. At that time, finance companies in her geographical location requiring agreements to arbitrate were still a distinct *752 minority.[5] Thus, for all that appears in the record, one must conclude that she couldwith a minimum of efforthave acquired financing without agreeing to arbitrate her claims.
In fact, she testified that she had borrowed money from "Citizens Bank" in Greensboro on two occasions since 1995 and that neither transaction involved an arbitration agreement. Moreover, she testified that, in seeking the loan of November 2, 1995, she contacted no entity other than American General. In other words, she did not shop around for a loan that did not involve an agreement to arbitrate. She testified that she asked no questions about the arbitration provisions in the Note and Security Agreement. Indeed, she testified that she did not read the Note and Security Agreement. Consequently, she has not demonstrated that she had no meaningful choice; therefore, the second Layne v. Garner factor is not satisfied in her case.
For these reasons, we conclude that the trial court erred in holding that Reaves's arbitration agreement was unconscionable. The order in case 1990888 is, therefore, reversed, and that case is remanded.

Conclusion
In summary, the order in the Branch case is affirmed. The order in the Reaves case is reversed and the case is remanded.
1990887AFFIRMED.
HOUSTON, LYONS, JOHNSTONE, and ENGLAND, JJ., concur.
HOOPER, C.J., and MADDOX, SEE, and BROWN, JJ., dissent.
1990888REVERSED AND REMANDED.
HOUSTON, SEE, LYONS, and ENGLAND, JJ., concur.
HOOPER, C.J., and MADDOX and BROWN, JJ., concur in the result.
JOHNSTONE, J., dissents.
HOOPER, Chief Justice (concurring in the result in case 1990888, but dissenting in case 1990887).
I concur in the result in Reaves's case that she should be compelled to arbitrate her dispute with the defendants. However, I disagree with the holding that Branch need not arbitrate her dispute with those same defendants; therefore, in the Branch case I respectfully dissent.
The trial court and this Court have focused almost exclusively on the issue of unconscionability, something I must admit is often in the eye of the beholder. I would argue that there is a question as to whether such an argument can be maintained because one of the elements of unconscionability is that "there was an absence of meaningful choice on one party's part."[6]Layne v. Garner, 612 So.2d 404, *753 408 (Ala.1992). However, that is not my primary objection to the main opinion.
As with any kind of contract provision, a person who agrees to arbitrate disputes may not get another bite at the apple if that person experiences a change of heart and decides that arbitration is not what she wants. An agreement solemnized by a written pledge to the other party is not so lightly disregarded in Alabama or in the law generally. See Locklear Dodge City, Inc. v. Kimbrell, 703 So.2d 303, 306 (Ala. 1997) ("To hold otherwise would turn the concept of `sanctity of contract' upside down.")
In passing the Federal Arbitration Act ("FAA"), Congress sought to set "arbitration agreements upon the same footing as other contracts." Shearson/American Express, Inc. v. McMahon, 482 U.S. 220, 225-26, 107 S.Ct. 2332, 96 L.Ed.2d 185 (1987). The United States Supreme Court has interpreted the FAA as prohibiting states from declaring that "a contract is fair enough to enforce all its basic terms (price, service, credit), but not fair enough to enforce its arbitration clause," and that Court has stated, "The Act makes any such state policy unlawful, for that kind of policy would place arbitration clauses on an unequal `footing,' directly contrary to the Act's language and Congress' intent." Allied-Bruce Terminix Cos. v. Dobson, 513 U.S. 265, 281, 115 S.Ct. 834, 130 L.Ed.2d 753 (1995).
Beyond the issue whether this particular dispute is covered by the arbitration agreement entered into by Branch, we have the question as to what forum should determine whether the dispute is arbitrable. That question, known as the question of "arbitrability," is separate and distinct from the unconscionability issue. The agreements signed by Branch each contained the following clause: "Borrower(s) and Lender further agree that all issues and disputes as to the arbitrability of claims must also be resolved by the arbitrator." (Bold print original.) While the presumption is in favor of arbitration of disputes in the uncertain case, the presumption is against arbitration of the question of arbitrability unless the contract clearly sets out that the parties agreed to have the arbitrator decide the issue of arbitrability. In First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995), the Supreme Court stated: "This Court, however, has ... added an important qualification, applicable when courts decide whether a party has agreed that arbitrators should decide arbitrability: Courts should not assume that the parties agreed to arbitrate arbitrability unless there is `clea[r] and unmistakabl[e]' evidence that they did so." 514 U.S. at 944, 115 S.Ct. 1920 (quoting AT & T Technologies, Inc. v. Communications Workers of America, 475 U.S. 643, 649, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986)); see also Brilliant Homes, Ltd. v. Lind, 722 So.2d 753 (Ala.1998), and Ex parte Perry, 744 So.2d 859 (Ala.1999) (providing a detailed discussion of "arbitrability" and First Options, supra).
Branch's agreement to submit the arbitrability question to the arbitrator could not be any clearer. The clause is in no way ambiguous, and it is highlighted in bold print. The most cursory glance at this contract would reveal something special about that clause even to the laziest consumer eye. The questionable determination of unconscionability should not *754 trump the arbitrability clause. Therefore, in the Branch case I would grant the mandamus petition and direct the trial court to grant the motion to compel arbitration.
SEE, Justice (concurring in case 1990888, dissenting in case 1990887)
I concur in the main opinion as it relates to the Reaves case. Reaves did not demonstrate that to obtain financing she had to accept the arbitration agreementthat she had "no meaningful choice." The trial court erred in holding that her contract was unconscionable. I dissent, however, from the main opinion as it relates to the Branch case.
In Green Tree Financial Corp. of Alabama v. Vintson, 753 So.2d 497, 504 (Ala. 1999), this Court rejected the plaintiffs' claims that they had "no meaningful choice" with respect to an arbitration provision in a mobile-home sales contract. The plaintiffs claimed that all of the lenders through which the mobile-home seller financed purchases had arbitration provisions in their financing agreements. Id. at 504. However, there was evidence that at least one of the lenders doing business with the mobile-home seller did not have an arbitration provision in its financing agreement at the time of the plaintiffs' purchase, and the plaintiffs failed to present any evidence "to suggest that any of the lenders through which [the seller] financed the purchases ... would have refused to finance the purchase had the [plaintiffs] objected to the arbitration provision." Id.
The main opinion concludes that Branch had "no meaningful choice" in obtaining financing because "only 1 or 2 companies out of 16 might have allowed her to borrow money ... without agreeing to arbitrate,"[7] 793 So.2d at 751, but Branch presented no evidence indicating that she shopped around before borrowing from American General.
I see no meaningful difference between the evidence presented in Vintson and that presented here by Branch. Therefore, I would hold that, under the rule set out by this Court in Vintson, the trial court erred in holding that the arbitration provision in Branch's contract was unconscionable and therefore unenforceable.

On Application for Rehearing in Case No. 1990887
PER CURIAM.
APPLICATION OVERRULED.
MOORE, C.J., and JOHNSTONE, HARWOOD, and WOODALL, JJ., concur.
LYONS, J., concurs specially.
HOUSTON, SEE, BROWN, and STUART, JJ., dissent.
LYONS, Justice (concurring specially).
First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995), dealing only with the question whether an arbitration agreement was executed, held that a clear expression of intent to arbitrate the question of arbitrability would place that issue before the arbitrator and not the court. In Prima Paint Corp. v. Flood & Conklin Mfg. Co., 388 U.S. 395, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967), decided 28 years earlier, the United States Supreme Court had held *755 that the issue of unconscionability was for the court and not the arbitrator. First Options, which does not involve claims of fraud in the inducement of the arbitration clause or claims that the clause was unconscionable, does not even mention Prima Paint.
Until the issue is squarely addressed, I am unwilling to extend First Options to a case involving the defense of unconscionability on a theory that First Options has, sub silentio, modified Prima Paint. The further erosion of the authority of the court, in deference to an hourly compensated arbitrator with a vested interest in retaining rather than relinquishing jurisdiction, raises troubling questions of due process, especially where, as here, the issue of unconscionability goes to the fundamental fairness of the proceeding. We should not extend First Options beyond the context of the issues presented in that case, without some statement from the United States Supreme Court as to the continued precedential value of Prima Paint.
NOTES
[1] "Flipping" has been described as "a practice whereby customers are encouraged to refinance existing loans rather than make new and separate loans." Williams v. Norwest Fin. Alabama, Inc., 723 So.2d 97, 104 (Ala.Civ.App.1998).
[2] As the trial court noted, American General has "stipulated" that, if "the Court compels the plaintiff to submit the claims to arbitration, the arbitrator shall be entitled to award compensatory damages in the same manner in which a judge or jury would award such damages under Alabama law if this case [had] proceeded to trial." However, the proposal raises a host of issues relating to the efficacy if not the relevancyof that stipulation, including accord and satisfaction, anticipatory breach, and novation, none of which has been briefed or discussed. We, therefore, do not consider it.
[3] Branch is a resident of Gallion, Alabama. We take judicial notice of the fact that she lives nearer to the City of Tuscaloosa than to any other city of comparable size.
[4] Incidentally, many of these entities filed copies of their arbitration provisions. None of those samples limits, as American General's material purports to do, the amount of damages the arbitrator could award.
[5] Reaves lives in Greensboro. We take judicial notice of the fact that she lives nearer to the City of Tuscaloosa than to any other city of comparable size.
[6] Branch was certain that she had negotiated a loan in the past with the First Bank of Linden. The documents supporting that lending agreement did not contain an arbitration clause. Yet, she went to American General to borrow money and did not go to the First Bank of Linden to obtain the loan that is the subject of this controversy. She also has no recollection as to whether documents for loans she has had with Robinson Bank and Commercial Bank contained arbitration agreements. American General employees also testified that American General has never refused to extend a loan to a customer who requested the deletion of the arbitration agreement from the loan contract. These facts alone indicate to me that Branch had meaningful choices with respect to obtaining a loan that did not contain an arbitration clause. Green Tree Fin. Corp. v. Vintson, 753 So.2d 497 (Ala.1999) (Lyons, J., concurring specially) (lack of "mutuality of remedy" alone is not enough to make arbitration agreement unconscionable); Mitchell Nissan, Inc. v. Foster, 775 So.2d 138 (Ala.2000) (plaintiff failed to show that he had no meaningful options).
[7] In this case, unlike the situation in Vintson, there was evidence in the record indicating Branch knew of at least one other lending institution from which she could have obtained a loan that did not require an arbitration clause. Branch had previously negotiated a loan with the First Bank of Linden, and the documents supporting that transaction did not contain an arbitration provision.