Alafabco, Inc., appeals from the trial court's order granting the motion of The Citizens Bank and its employees to compel arbitration of this dispute. We reverse and remand. *Page 799 
 I. Factual Background
The relationship between the parties and the genesis of this dispute were briefly summarized in a complaint filed on November 15, 2000, by Alafabco, Inc., and three of its officers or employees, namely, Donnie Cottingham, Joann Beck, and Weston Beck, against the Bank and a number of its employees, including Doug Alexander, Roger Campbell, and Wayne Gentry (hereinafter referred to collectively as "the Bank"). In pertinent part, the complaint alleged:
 "6. In 1986, the plaintiffs and defendants entered into a quasi-contractual relationship wherein the plaintiffs secured construction contracts and the defendants provided the necessary operating capital to complete the project. Upon completion of a project, the plaintiffs repaid the funds, together with accrued interest, to the defendants.[1]
 "7. The plaintiffs continued to operate under the implied agreement until 1998, at which time the defendants encouraged plaintiffs to bid on a large project [for Champion International (the full and correct name of this company is not clear from the record) at its facilities in Courtland, Alabama,] and then, when plaintiffs' bid was accepted and plaintiffs began work, the defendants refused to provide the necessary operating capital for the completion of the contract. As a result of the defendants' breach of the agreement, the plaintiffs began to incur massive debt."
According to Alafabco, it attempted to compensate for the alleged breach by "using the monies provided by The Bank in the prior funding." Appellant's Brief, at 4. Nevertheless, it "became delinquent in repaying its existing obligations to [the] Bank." Appellant's Brief, at 4. Subsequently, the parties negotiated an agreement, pursuant to which "all of the loans with the Plaintiffs were restructured and redocumented through various notes dated May 3, 1999." Appellees' Brief, at ix. Along with the "renewal notes" executed as a result of these negotiations, the parties signed a document containing the following pertinent provisions:
 "AGREEMENT TO ARBITRATE. The Citizens Bank (`Lender') and the undersigned agree that all disputes, claims, or controversies (`Disputes') between them, whether individual, joint, or class in nature, including contract and tort disputes and any other matter at law or equity, shall be resolved by arbitration upon request of either party at any time, notwithstanding the prior filing by either party of any legal action, except as otherwise indicated in this Agreement or agreed to in writing by the parties. In an arbitration, an arbitrator, who is an independent, neutral party, gives a decision after hearing the positions of the parties. It is understood and agreed that arbitration pursuant to this agreement shall be binding upon both parties and that both parties are waiving their respective rights to a jury trial. However, nothing in the loan documents or this agreement shall preclude any party from seeking equitable relief from a court of competent jurisdiction.
". . . .
 "GOVERNING LAW. The Federal Arbitration Act shall apply to the construction, interpretation, and enforcement of this arbitration agreement. The arbitration of any dispute shall be governed by the Rules of the American Arbitration Association. If there is an *Page 800 
inconsistency between these rules and this Agreement, this Agreement shall govern."
Subsequently, Alafabco defaulted on its payments under the "renewal notes," and, it alleges, the Bank published notices of foreclosure on its property. Consequently, Alafabco sought bankruptcy protection in the United States Bankruptcy Court for the Northern District of Alabama. That action was settled and Alafabco's petition in bankruptcy was dismissed.
However, that settlement involved a second debt restructuring, evidenced by a second set of renewal notes executed December 10, 1999. At that time, the amount allegedly due the Bank was approximately $430,000. The debt restructuring involved a note of the individual plaintiffs, secured by a mortgage on commercial real estate owned by Cottingham and the Becks; a note of Alafabco, secured by accounts receivable, inventory and supplies, fixtures, machinery and equipment, and motor vehicles; and a mortgage on Cottingham's house. That same day, the parties also executed an arbitration agreement containing provisions functionally identical to the arbitration agreement signed on May 3, 1999 (the May 3, 1999, arbitration agreement and the December 10, 1999, arbitration agreement are hereinafter referred to collectively as "the Arbitration Agreements").
The plaintiffs' 18-count complaint, filed nearly a year after the execution of the second set of renewal notes, sought compensatory and punitive damages under multiple theories, including breach of contract, fraud, breach of fiduciary duties, defamation, conspiracy, intentional infliction of emotional distress, and interference with a contractual or business relationship. The Bank moved to compel arbitration of the dispute, based on the Arbitration Agreements. The trial court granted the motion, and Alafabco appealed.
 II. Discussion
On appeal, Alafabco contends that the Arbitration Agreements are unenforceable because, it argues, the transaction at issue does not have a nexus with interstate commerce sufficient to invoke the Federal Arbitration Act, 9 U.S.C. § 1 et seq. ("the FAA"). The Bank's first response is that the agreements are enforceable whether or not the transaction has a connection with interstate commerce. This is so, because, it argues, this case involves postdispute agreements, which, it contends, are not contrary to state law. More specifically, it states: "[T]he Plaintiffs entered into the Arbitration Agreements after they hadalready defaulted on their various obligations to the Bank. . . . As a material consideration to the restructuring of [their] obligations, the plaintiffs agreed to submit any dispute heretofore or thereafter arising . . . to binding arbitration." Appellees' Brief, at 2 (emphasis added). "Therefore," the Bank continues, "the Arbitration Agreements . . . were executed after a dispute had already arisen and were not subject to the [interstate-commerce] restriction" as would be the case had they been executed before the dispute. Appellees' Brief, at 4. We disagree with the Bank — not with its characterization of the chronology of events,[2] but with its conclusions.
Unlike predispute arbitration agreements, which contravene Ala. Code 1975, § 8-1-41(3), postdispute arbitration agreements are enforceable in Alabama, either under the Alabama Arbitration Act, Ala. Code 1975, *Page 801 
§§ 6-6-1 to -16 ("the AAA"), or at common law. Ala. Code 1975, §6-6-16; Fuerst v. Eichberger, 224 Ala. 31, 33, 138 So. 409, 410 (1931); Rodney Max, "Arbitration — the Alternative to Timely, Costly Litigation," 42 Ala. Lawyer 309, 317-18 (1981). However, there is no evidence in this case of an agreement to proceed under the AAA or the common law. On the contrary, the Arbitration Agreements provided: "TheFederal Arbitration Act shall apply to the construction, interpretation, and enforcement of this Agreement." (Emphasis added.)
Moreover, the Bank did not propose in the trial court to arbitrate outside the framework of the FAA. On the contrary, it based its "Motion to Stay Action and Compel Arbitration" on the FAA, stating: "An Agreement which contains specific provisions requiring parties to Arbitrate disputes involving or [a]ffecting interstate commerce is specifically enforceable under the Federal Arbitration Act, 9 U.S.C. § 1, et seq.; Allied-Bruce Terminix Companies v. Dobson, 115 S.Ct. 834 (1995)." It then cited various examples of how, in its view, "the dealings of the parties . . . substantially contemplated and impacted upon interstate commerce."
It repeated those contentions in its "Brief in Support [of the Motion] to Compel Arbitration." There, it also argued that this case is distinguishable from Sisters of the Visitation v. Cochran PlasteringCo., 775 So.2d 759 (Ala. 2000), in which this Court determined, applying a five-part test, that the transaction at issue there did not substantially affect interstate commerce, and, therefore, that an arbitration agreement was not enforceable under the FAA. In this case, neither the motion nor the supporting brief refers to the AAA or to arbitration under the rules of common law. Clearly, the parties did not contemplate arbitration under the authority of the AAA or the common law of Alabama. Consequently, arbitration of this dispute must proceed, if at all, under the FAA.
The FAA preempts Alabama law disfavoring predispute arbitration agreements only if the dispute is subject to a written arbitration agreement "relating to a transaction substantially affecting interstate commerce." Ex parte Greenstreet, Inc., 806 So.2d 1203, 1209 (Ala. 2001); see also F.A. Dobbs Sons, Inc. v. Northcutt, [Ms. 1991155, November 2, 2001] 819 So.2d 607 (Ala. 2001). The proponent of arbitration bears the burden of proving a sufficient connection with interstate commerce,Brookfield Constr. Co. v. Van Wezel, [Ms. 1010353, June 28, 2002]841 So.2d 220, 222-23 (Ala. 2002); TranSouth Fin. Corp. v Bell, 739 So.2d 1110
(Ala. 1999), applying the five-part test set forth in Sisters of theVisitation.
In an attempt to carry this burden, the Bank presented the affidavit of Roger Campbell, its "president and chief executive officer." He recited the following factors as bearing on the interstate-commerce question:
 "The Citizens Bank is a lending institution which routinely conducts business in interstate commerce, such as the business conducted between it and the Plaintiffs, at issue in this litigation. The business records attached as Exhibit A and Exhibit B clearly demonstrate that a substantial portion of the money loaned by [the Bank] to Alafabco was used to finance labor and materials used by Alafabco to perform work at a Champion International facility in North Carolina. Additionally, the security interest held by The Citizens Bank in assets of the Plaintiffs include inventory manufactured and created using sub-products obtained outside the state of Alabama, utilizing raw materials manufactured outside the state of Alabama and sold through utilization of the U.S. mails, telephones and other methods of communication through interstate *Page 802 
commerce. The security interest of The Citizens Bank and accounts receivable of the plaintiff Alafabco, Inc., are distributed through the U.S. mails, payments are obtained through the U.S. mails and proceeds are deposited in bank accounts subject to Federal Regulations and clearance through interstate settlement procedures and policies. The debt restructuring at issue in this matter was carried out in the course of a proceeding in the United States Bankruptcy Court, a court which has a profound impact upon interstate commerce, in my judgment. Moreover, payments by and between the parties in connection with their dealing were made by check which were cleared by the Federal Reserve, using the U.S. mails and interstate financial settlement procedures and institutions. In the course of dealings between the parties, The Citizens Bank mailed notices of foreclosure and other correspondence related to the dealing between the parties through the United States Postal Service. Further, the policies and procedures governing the actions of The Citizens Bank, its officers, employees and governing the transactions between the parties to this litigation were subject to regulation by Federal Agencies and Federal Laws. Further, the loans issued by The Citizens Bank and the debt restructuring at issue facilitated the operation of Alafabco, Inc., which did business affecting interstate commerce, and directly engaged in interstate commerce, including contract work in North Carolina and the state of Tennessee, as demonstrated by the attached records."
These recitations fall into six general categories, namely, (1) the nature of the Bank's business; (2) the nature of Alafabco's business; (3) the general "course of dealings between the parties"; (4) the use of various communication media in dealings between the parties; (5) the existence of federal regulations; and (6) the nature of the specific transaction at issue. We shall address these categories in the context ofSisters of the Visitation.
Recently, we stated:
 "The test adopted in Sisters of the Visitation focuses on the quantity and quality of involvement of foreign entities with the subject transaction. Specifically, the subjects of inquiry are (1) the `citizenship of the parties,' (2) the origin of any `tools and equipment' actually used in the transaction, (3) the `allocation of cost of services and materials,' (4) the `subsequent movement across state lines' of the `object of the services,' and (5) the `degree of separability from other contracts.' 775 So.2d at 765-67. An analysis applying these factors is `necessarily fact intensive.' Id. at 765 n. 5."
Brookfield Constr. Co. v. Van Wezel, [Ms. 1010353, June 28, 2002]841 So.2d 220, 221 (Ala. 2002).
 A. Categories One, Two, and Three
The Bank argues that the overall nature of its business operations, those of Alafabco, and the "course of dealings of the parties" supports arbitrability. We disagree with this argument. Indeed, these factors are largely irrelevant to an FAA interstate-commerce analysis.
The FAA renders enforceable any "written provision in any maritimetransaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of suchcontract or transaction, . . . or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract,transaction, or refusal . . . ." 9 U.S.C. § 2 (emphasis added). Thus, on its face, the FAA applies only to "transactions," "contracts," and "controversies."
The FAA defines "transactions" in the maritime context, as including "charter parties, bills of lading of water carriers, *Page 803 
agreements relating to wharfage, supplies furnished vessels or repairs to vessels, collisions, or any other matters . . . which, if the subject ofcontroversy, would be embraced within admiralty jurisdiction."9 U.S.C. § 1 (emphasis added). The FAA focuses on the narrow concepts of acts, omissions, or agreements, not on the broader concepts on which the Bank focuses, such as the nature of the parties' businesses or the general "course of dealings between the parties." Thus, the facts that the Bank "routinely conducts business in interstate commerce"; that Alafabco owns and uses materials "manufactured outside the state of Alabama"; and that Alafabco operates its business with funds borrowed from the Bank cannot support arbitrability of this dispute.
Moreover, under §§ 1 and 2, the FAA applies only where the transaction affecting interstate commerce is the "subject of [the] controversy." The relevant transactions in this case are the debt restructurings of May 1999 and December 1999, evidenced by the renewal notes and the attendant Arbitration Agreements. Indeed, the Bank characterizes the dispute as "whether Alafabco was in default on the contract[s] between it and the Bank." Appellees' Brief, at 4. Thus, testimony regarding loans to Alafabco cannot support arbitrability, absent a showing that — at a minimum — they were part of the restructured debt, that is, that they were somehow involved in thisdispute. For these reasons, the recitations related to categories one, two, and three do not establish that the transaction had a substantial effect on interstate commerce.
 B. Categories Four and Five
The Bank argues that involvement of the various forms of communication recited in Campbell's affidavit, such as the United States Postal Service "and other methods of communication," as well as the existence of federal regulations governing loan transactions and deposits in general, can support arbitrability. We disagree with this argument also.
Much of the rationale in the preceding section weighs with equal force against this argument. Additionally, the substantial-effect test ofSisters of the Visitation logically contemplates the converse, namely, the de minimis effect. Thus, in Aronov Realty Brokerage, Inc. v. Morris, [Ms. 1001292, April 26, 2002] 838 So.2d 348 (Ala. 2002), a plurality of this Court recently concluded that a $1,000 earnest-money deposit on the purchase of a condominium unit paid to Regions Bank, allegedly a foreign corporation, "was de minimis as compared to the entire purchase price [of $106,000 plus miscellaneous charges and fees]." So.2d at 359. Consequently, the transaction did not satisfy the Sisters of theVisitation substantial-effect test. This was true, even when considered in the aggregate with "combined payments to State Farm, also a foreign corporation, . . . of $217 and $214 for contents insurance and flood insurance," and a $495 payment for a "home warranty through American Home Shield," also a foreign entity. Morris, 838 So.2d at 359. The combined payments "represent[ed] less than one percent of the purchase price." Id. See also Ex parte Learakos, [Ms. 1000244, July 13, 2001] 826 So.2d 782
(Ala. 2001) ("the ostensible transfer of the funds for the plaintiff's $1,000 earnest money payment from the drawee bank in Illinois to the Alabama payee of the check drawn in Alabama [did] not establish a substantial effect of [a] real estate sale and purchase on interstate commerce").
The interstate communications services and sundry federal regulations on which the Bank seeks to rely touch this transaction so remotely and tangentially as to warrant no consideration. Holding that a transaction is subject to the FAA simply by virtue of the ordinary use of interstate *Page 804 
communication media in its furtherance, or by Congressional regulation of some aspect of one party's business, would effectively transform every "local" transaction into a "national" one. As Sisters of the Visitation
points out, such an approach is impermissible under our federal system of government. 775 So.2d at 767 (citing NLRB v. Jones Laughlin SteelCorp., 301 U.S. 1, 37 (1937)).
 C. Category Six
Finally, we address the Bank's contentions regarding the transaction at issue, specifically, Campbell's affidavit testimony that "the loans issued by The Citizens Bank and the debt restructuring at issue facilitated the operation of Alafabco, Inc., which did business affecting interstate commerce, and directly engaged in interstate commerce, including contract work in North Carolina and the state of Tennessee, as demonstrated by the attached records." This testimony touches on a valid consideration, and, if supported by the record, could afford a basis for arbitrability. This is so, because it suggests that part of the money specifically involved in the debt restructuring was used to finance operations in North Carolina and Tennessee.
In that connection, the record contains four invoices, three of which evidence interstate transactions. In particular, Alafabco invoice 676 in the amount of $39,574.36, dated August 21, 1995, is addressed to "Champion International, Main Street, Canton, NC." The subject of invoice 676 is "Doctor Blade Maintenance, Canton Mill," and the invoice includes an itemization of charges for materials, labor, lodging, and travel. Alafabco invoice 681 for $9,209, dated August 18, 1995, bears the same address. The subject of invoice 681 is the installation of a fan, and the prices are itemized as in invoice 676. Alafabco invoice 685 for $11,500 is addressed to Champion International, at its Courtland, Alabama, facility. Alafabco invoice 796, dated December 20, 1995, is addressed to "SCA Services, 6919 Flagstone Drive, Ooltewah, TN," and is in the amount of $4,000. The subject of invoice 796 is "Agusta Newsprint Doctor Blade maintenance."
The record further contains an instrument dated August 23, 1995, evidencing the loan of $31,659.49 from the Bank to Alafabco, namely, "Loan Number 3068814." The instrument specifically references invoice 676. The maturity date of that loan was November 21, 1995, at which time a "single payment of all principal and interest [was] due." The record contains a similar instrument dated August 31, 1995, evidencing the loan of $21,130.01, namely, "Loan Number 3068897." Loan Number 3068897 specifically referenced invoice 681 and invoice 685, and exhibited a maturity date of November 29, 1995. On that date, a "single payment of all principal and interest [was] due." These loans apparently financed the transactions evidenced by invoices 676, 681, and 685.
However, those projects all occurred in 1995, three years before the occurrence of any of the events made the basis of Alafabco's complaint or of the alleged defaults that precipitated the debt restructuring. There is no evidence indicating that Alafabco defaulted on either of those loans. Thus, for all that appears, those transactions had nothing to do with this controversy. In other words, the Bank made no showing as to what portion — if any — of Loan Number 3068814 or Loan Number 3068897 remained unpaid at the time of the debt restructuring. It made no showing as to what portion — if any — of the restructured debt was attributable to the 1995 loans. Having thus failed to show the quantity and quality of involvement of the North Carolina and Tennessee projects with the subject transaction, it showed — at *Page 805 
most — a mere "proximity of [the subject transaction] to contracts substantially affecting interstate commerce." Sisters of the Visitation, 775 So.2d at 767. On the state of the record, in other words, the 1995 projects are wholly "separable" from the subject transaction. Id.
Moreover, under Sisters of the Visitation and its progeny, "the simple fact that loan proceeds are `mobile' does not require the conclusion that all loan transactions are inherently interstate in nature." AlternativeFin. Solutions, LLC, v. Colburn, [Ms. 1001285, November 16, 2001]821 So.2d 981, 986 (Ala. 2001). Compare American Gen. Fin., Inc. v. Branch,793 So.2d 738, 747 (Ala. 2000), cert. denied, 534 U.S. 949, 122 S.Ct. 342
(2001), in which evidence was presented that indicated that the relevant loan proceeds actually moved in interstate commerce, as did the payments. The Bank, however, made no showing that proceeds, or payments, moved in interstate commerce, that is, it made no showing of arbitrability under the fourth Sisters of the Visitation factor ("subsequent movement across state lines").
 III. Conclusion
In short, it is undisputed that the parties in this case are Alabama residents. The Bank did not show that any portion of the restructured debt was actually attributable to interstate transactions; that the funds comprising that debt originated out-of-state; or that the restructured debt was inseparable from any out-of-state projects. Consequently, the Bank failed to carry its burden of proof on the interstate-commerce issue.
For this reason, the trial court erred in granting the Bank's motion to compel Alafabco to arbitrate its dispute with the Bank. That order is, therefore, reversed, and the cause is remanded for further proceedings consistent with this opinion.
REVERSED AND REMANDED.
HOUSTON, LYONS, BROWN, JOHNSTONE, HARWOOD, and STUART, JJ., concur.
MOORE, C.J., concurs in the result.
SEE, J., dissents.
[1] The bank loans were secured by invoice numbers of the jobs to be performed by Alafabco. Appellant's Brief, at 3.
[2] In fact, we need not — and do not — decide whether the Arbitration Agreements are predispute or postdispute agreements.