ON APPLICATION FOR REHEARING
This Court's original opinion dated August 23, 1991, is withdrawn, and the following is substituted therefor:
Shoals Ford, Inc., appeals from a judgment based on a jury verdict in favor of Maxine Clardy, as conservator for Bobby Joe Clardy. We affirm.
Ms. Clardy sued Shoals Ford, seeking to have a transaction entered into between Shoals Ford and her husband Bobby Joe for the purchase of a 1989 Ford pickup truck set aside and to recover the monies paid by Bobby Joe to Shoals Ford, alleging that Bobby Joe suffered from a manic-depressive disorder[1] and was in a manic state when he transacted with Shoals Ford to purchase the truck and also alleging that Shoals Ford was negligent,[2] wanton, and willful in dealing with Bobby Joe. She sought compensatory damages, punitive damages, and rescission of the contract. Shoals Ford answered, asserting that it had acted without notice of Bobby Joe's incompetency, that the conservatorship proceeding was not instituted until nearly a month after Bobby Joe had purchased the truck, that the family members had been contributorily negligent in assisting Bobby Joe in purchasing the truck, and that there had been an accord and satisfaction. It amended its answer, adding the affirmative defense of estoppel and pleading "that there was no failure of consideration or undue influence taken of" Bobby Joe in his purchase of the truck and that Ms. Clardy failed to mitigate damages. Both Shoals Ford and Ms. Clardy filed motions for summary judgment, which the trial court denied. Both Shoals Ford and Ms. Clardy moved for a directed verdict, which the trial court denied. The jury returned a verdict in favor of Ms. Clardy in the amount of $6,715.02 in compensatory damages and $18,000 in punitive damages. Shoals Ford filed a motion for new trial or, in the alternative, for judgment notwithstanding the verdict, which the trial court denied. Shoals Ford appeals.
Shoals Ford contends that the evidence was insufficient to sustain the jury's verdict, because, it argues, Ms. Clardy failed to establish the elements necessary for recovery *Page 881 
in this case, specifically those elements relating to the incapacity of Bobby Joe at the time he consummated the transaction and took possession of the truck. It contends that the contract was completed, that the truck was delivered, and that Bobby Joe took possession of the truck, all on April 3, 1989, when all of the paperwork was finalized, and that, on that date, Bobby Joe was not incompetent.
Ms. Clardy contends that the evidence establishes that Bobby Joe completed the transaction on April 5, 1989, when he took actual possession of the truck, i.e., when he drove the truck off the lot, and that, on that date, he was incompetent to handle his affairs.
The well-settled law in Alabama is that contracts of insane persons are wholly and completely void. See, Williamson v.Matthews, 379 So.2d 1245 (Ala. 1980); Ala. Code 1975, §8-1-170. In McAlister v. Deatherage, 523 So.2d 387, 388 (Ala. 1988), quoting from Weaver v. Carothers, 228 Ala. 157, 160,153 So. 201, 202 (1934), this Court explained the cognitive (understanding) test that Alabama adopted in order to determine whether a contract can be avoided because of insanity:
 " '[To] avoid a contract on the ground of insanity, it must be satisfactorily shown that the party was incapable of transacting the particular business in question. It is not enough that he was the subject of delusions not affecting the subject-matter of the transaction, nor that he was, in other respects, mentally weak. A party cannot avoid a contract, free from fraud or undue influence, on the ground of mental incapacity, unless it can be shown that his insanity . . . was of such character that he had no reasonable perception or understanding of the nature and terms of the contract.' "
Viewing the tendencies of the evidence most favorably to the prevailing party and indulging all reasonable inferences that the jury was free to draw, as required under our applicable standard of review, see Warren v. Ousley, 440 So.2d 1034 (Ala. 1983), we find the following:
On April 1, 1989, Bobby Joe talked to Kelly Cole of Shoals Ford concerning the purchase of a truck; on that day he filled out the initial papers. By April 3, 1989, all the necessary paperwork had been completed and Bobby Joe had signed the necessary documents, but when he went to pick up the truck, he was advised that because of his poor credit rating, Shoals Ford would require a $10,500 down payment instead of the $5,000 down payment previously discussed. On April 5, 1989, Bobby Joe returned to Shoals Ford with the down payment and, at that time, picked up the truck.[3]
According to Ms. Clardy, Bobby Joe had suffered from a manic-depressive disorder for 15 years and was taking lithium to control his condition. She said that she observed in mid-March 1989 that Bobby Joe was becoming manic, but she said that because he was not violent and had not endangered himself or anyone else at that time, she could not involuntarily commit him for treatment. On April 5, 1989, Ms. Clardy received a telephone call from Leslie Clardy Daniel, Ms. Clardy and Bobby Joe's daughter ("the daughter"), concerning Bobby Joe's condition. The daughter told Ms. Clardy that Bobby Joe had threatened her and had obtained $500 from her to make the down payment on a truck he was going to buy from Shoals Ford. Subsequently, Ms. Clardy drove to Shoals Ford and noticed that the truck Bobby Joe had previously looked at, in her presence, was still on the lot. At that time she spoke with a salesperson, and she later telephoned a sales representative with Shoals Ford, concerning Bobby Joe's incompetency and asked that they not allow Bobby Joe to take the truck — that is, she told them that Bobby Joe was not working, that he was ill and would be committed, and that the truck *Page 882 
could not be insured. Thereafter, on April 5, 1989, Shoals Ford gave Bobby Joe possession of the truck after he gave it $10,000 as the down payment.[4] Ford Motor Credit Company eventually repossessed and sold the truck and mailed Ms. Clardy a check for $3,284.98, which left a balance of $6,715.02 of the $10,000 down payment unrecovered by Ms. Clardy.
According to the daughter, when Bobby Joe visited her around April 1, 1989, she tried to get him to resume taking his medicine. He became agitated and went out of control, threw his medicine into a burning pile of leaves, and then left. Around 5 A.M. on April 5, 1989, Bobby Joe returned to the daughter's house, banged on the doors and windows until he awakened the household, threatened their lives, and forced the daughter to write him a check for $500. When he left, the daughter telephoned 911 to report the incident and, as soon as the probate office opened, she telephoned the probate judge to inform him of the situation. She then went to her attorney's office, explained the situation to him, and asked that he prepare a petition to have Bobby Joe involuntarily committed for treatment. While in her attorney's office, she notified the bank to stop payment on the $500 check she had written to Bobby Joe and then called to notify Shoals Ford of Bobby Joe's mental condition, telling a representative that Bobby Joe would be coming in to purchase a truck, specifically describing the particular truck; telling the representative that Bobby Joe was not healthy; and telling the representative that she had filed a petition to have Bobby Joe involuntarily committed. She also asked Shoals Ford to call the Lauderdale County sheriff, a family member, her attorney, Riverbend Center for Mental Health, or the probate office for verification in the event Bobby Joe did appear at the dealership. She further explained to the representative that "buying sprees" was a symptom of Bobby Joe's illness, that he would not be able to make the payments, and that he was not insurable. When she notified Shoals Ford of the situation, it merely stated that if Bobby Joe had the money to purchase the truck, it was "none of her concern." Around 10 A.M. on April 5, 1989, she drove by Shoals Ford and, noticing that the truck was still there, she once again telephoned "to plead" with Shoals Ford to notify her when Bobby Joe arrived. At this time, the representative told her that "it was really not of concern to Shoals Ford."
According to Dr. Joseph W. Glaister, a local psychiatrist who had treated Bobby Joe since 1984, Bobby Joe suffered from a manic depressive illness, manic type, recurrent. Dr. Glaister testified that Bobby Joe's illness was episodic, that his competency could come and go, and that there were stages of the illness when, on mere observation, one might think that Bobby Joe was a slightly excessive, overly friendly individual. He further testified that Bobby Joe had been admitted to the hospital after regular working hours on April 5, 1989, and that when he saw Bobby Joe on April 6, 1989, Bobby Joe was incompetent. Furthermore, according to the testimony of Dr. Glaister, he could not visualize Bobby Joe being otherwise on April 5, 1989.
The daughter's attorney testified that he remembered the events of April 5, 1989, when the daughter contacted him, when he obtained a history of the events of the day, and when he prepared the commitment petition and other documents that were filed with the probate court on that morning. He stated that he did not prepare and file the petition to appoint Ms. Clardy as conservator and limited guardian for Bobby Joe until a month after the petition to commit, because Bobby Joe was hospitalized during that period of time and, in the attorney's opinion, had no opportunity to dissipate his estate.
Based on the foregoing, we hold that there was sufficient evidence to support the jury's verdict that during the period in question — from April 1, 1989 (when Bobby Joe began negotiations to purchase the *Page 883 
truck), to April 3, 1989 (when Shoals Ford alleges the transaction was completed), to April 5, 1989 (when Ms. Clardy alleges the transaction was completed) — Bobby Joe was incompetent; that during that period of time, he was incapable of understanding and appreciating the nature, terms, and effect of the contract.
Shoals Ford also contends that the trial court erred in failing to give its requested jury charges and, following timely objection, erred in refusing to cure its errors.
In a jury case, a party is entitled to have its case tried to a jury that is given the appropriate standard by which to reach its decision, and a wrongful refusal of a requested jury charge constitutes a ground for a new trial. See, C.I.T. FinancialServices, Inc. v. Bowler, 537 So.2d 4 (Ala. 1988). An incorrect, misleading, erroneous, or prejudicial charge may form the basis for granting a new trial. See, Nunn v.Whitworth, 545 So.2d 766 (Ala. 1989). However, the refusal of a requested, written instruction, although a correct statement of the law, is not cause for reversal on appeal if it appears that the same rule of law was substantially and fairly given to the jury in the trial court's oral charge. See, Rule 51, Ala.R.Civ.P. When examining a charge asserted to be erroneous, this Court looks to the entirety of the charge to see if there is reversible error. See, Grayco Resources Inc. v. Poole,500 So.2d 1030 (Ala. 1986).
The trial court charged the jury as follows:
 "I . . . charge you that manic depression is a mental illness, but that is not to say that all manic-depressives may be classified as legally insane. Some are and some are not. In order to determine if a person is legally insane, you will have to determine whether or not he, [Bobby Joe] in this case, had sufficient capacity to understand in a reasonable manner the nature and effect of the act he was doing. Or put another way, that he had a reasonable perception or understanding of the nature and terms of the contract. And again, the issue is whether or not he had that mental capacity when he took possession of the truck."
Shoals Ford, objecting to that charge, alleged that the statement about when possession occurred, under the facts of this case, was confusing to the jury and was clearly a misleading statement of the law and the facts in this case. It contends that from the charge, the jury was left with the impression that it was to look only at the events on April 5, 1989 (the date Bobby Joe actually drove the truck from the lot), and not at the events occurring at any previous time (i.e., without regard to the negotiations of April 1, 1989, and the completion of the paperwork on April 3, 1989, which is the date Shoals Ford alleges possession occurred because all of the paper work had then been completed).
In response to Shoals Ford's objection to this charge, the following colloquy occurred:
 "[Shoals Ford's attorney]: I had an objection as to your charging the jury that . . . the contract was when the possession was taken and . . . in my opinion . . . whether or not there was a contract is not in question, but when the contract was is the jury's decision and you kept talking about possession.
 "The Court: . . . [You] argued that . . . [Bobby Joe] took possession on April the 3rd . . . and therefore [the fact] that he brought any money in on April the 5th would have nothing to do with it because by that time it was a done deal.
 "[Shoals Ford's attorney]: Okay. Well, I just thought it was sort of confusing if they thought . . . it was a done deal and [Bobby Joe] didn't take possession until the 5th.
 "[Ms. Clardy's attorney]: . . . [I] think it was clear that the contract is in effect upon delivery and it's up to [the jury] to decide whether it was the 3rd or the 5th.
"The Court: Right."
From a review of the record, it is apparent, as the trial court noted, that all of the evidence presented by Shoals Ford was intended to prove to the jury that on April 3, 1989, upon completing the negotiations and filling out the necessary paperwork with *Page 884 
Bobby Joe, even though Bobby Joe had not made the full down payment and even though he did not pick up the truck, it had delivered the truck to him and he had taken possession of the truck; not on April 5, 1989, when he actually made the full down payment and drove the truck from the dealership. An argument now that the above-quoted jury charge was misleading and confusing to the jury is without merit, especially in light of the fact that the trial court did not mention any specific dates — it did not mention either April 3, 1989, or April 5, 1989, as the date the jury was to consider. Furthermore, under the particular facts of this case, when considering the charge as a single entity, we cannot hold the trial court in error for so charging the jury. Rather, the trial court left the factfinding function to the jury; it simply guided the jury as to the applicable law.
We note that Shoals Ford contends that other specified charges were erroneous. However, it failed to argue those in its brief or to present legal authority to support such an argument or contention. Therefore, pursuant to Rule 29, A.R.App.P., we deem those contentions waived.
Shoals Ford also contends that the evidence is "so sparse and speculative" that it cannot justify the jury's finding of wantonness and its award of punitive damages. It bases its contention on the following argument:[5]
 "How can a verdict possibly be upheld that Shoals Ford was guilty of wantonness when it entered into a contract with [Bobby Joe] on April 3, 1989, with absolutely no notice from anyone as to [Bobby Joe's] possible incompetency? The evidence is undisputed that neither [Ms. Clardy nor the daughter nor] anyone on their behalf notified Shoals Ford prior to April 5, 1989. And the contacts which were made were dubious in that neither [Ms. Clardy nor] her daughter could, even at trial, name or identify one single person by name that they dealt with on that day. Neither did they instruct their lawyer or anyone else to call. How can this possibly meet the wantonness standards when there was no notice and only speculative identification?"
Whether a defendant's conduct was committed willfully, wantonly, or intentionally is a question for the jury on the issue of punitive damages (Surrency v. Harbison, 489 So.2d 1097
(Ala. 1986)), and on appeal there is a presumption of correctness as to the amount of punitive damages awarded by the trier of fact. See, Armstrong v. Roger's Outdoor Sports, Inc.,581 So.2d 414 (Ala. 1991) (a case in which this Court declared Ala. Code 1975, § 6-11-23(a), § 6-11-24(a), and the parenthetical portion of § 6-11-24(b) unconstitutional).
In Ala. Code 1975, § 6-11-20(b)(3), "wantonness" is defined as "conduct which is carried on with a reckless or conscious disregard of the rights and safety of others." In order to award punitive damages, the wanton conduct must be proven by "clear and convincing evidence," Ala. Code 1975, § 6-11-20(a), which is defined in § 6-11-20(b)(4) as follows:
 "Evidence that, when weighed against evidence in opposition, will produce in the mind of the trier of fact a firm conviction as to each essential element of the claim and a high probability as to the correctness of the conclusion. Proof by clear and convincing evidence requires a level of proof greater than a preponderance of the evidence or the substantial weight of the evidence, but less than beyond a reasonable doubt."
The jury heard the testimony and observed the evidence presented by both Shoals Ford and Ms. Clardy. From our review of the record, and without restating *Page 885 
the facts of this case, we hold that from that testimony and from that evidence the jury could have found the wantonness on the part of Shoals Ford necessary to justify the award of punitive damages.
Shoals Ford also contends that there was an accord and satisfaction of the contract as a matter of law. The jury having properly found that the contract between Shoals Ford and Bobby Joe was void because of Bobby Joe's incompetency, there can be no accord and satisfaction; therefore, we pretermit any discussion on this issue.
ORIGINAL OPINION WITHDRAWN; OPINION SUBSTITUTED; AFFIRMED; APPLICATION OVERRULED.
HORNSBY, C.J., and MADDOX, SHORES and KENNEDY, JJ., concur.
[1] Bobby Joe Clardy suffers from a mental disease known as bipolar disorder, which is more commonly called a manic-depressive disorder.
[2] Ms. Clardy subsequently withdrew the negligence count.
[3] Shoals Ford contends that the procedure it followed with Bobby Joe was what it called a "spot delivery," which is a procedure whereby a purchaser takes delivery before completing the down payment. Thus, it contends that delivery occurred on April 3, 1989, when the necessary paperwork was completed, even though Bobby Joe had not made the down payment and even though he did not actually pick up the truck at that time.
[4] Shoals Ford had increased the down payment from $5,000 to $10,500, but accepted the $10,000 amount for the down payment when Ms. Clardy and Bobby Joe's daughter stopped payment on the check the daughter says Bobby Joe forced her to write to him.
[5] We note that this constituted Shoals Ford's entire argument concerning the jury's finding of wanton conduct and its award of punitive damages. It did not argue that it had no duty to nullify the contract with Bobby Joe, absent a judicial determination of Bobby Joe's incompetence or something more definitive than the alleged phone calls from Ms. Clardy and the daughter to someone at the dealership concerning the situation, especially in light of the undisputed facts that a manic depressive's behavior is oftentimes difficult to ascertain and, as Dr. Glaister pointed out, "[there] are stages of the illness when, on mere observation, a person might think [Bobby Joe] was a slightly excessive, over-friendly individual."