Keisha Payne, the defendant in an action pending in the Lee Circuit Court, petitions for a writ of mandamus directing the circuit court to vacate its order compelling arbitration of Payne's counterclaims against the plaintiff, Jay Pontiac GMC Truck Mitsubishi, Inc. ("Jay Pontiac"). We grant the petition.
 I.
On March 7, 1997, Payne, a resident of Auburn, Alabama, visited Jay Pontiac at its principal place of business in Columbus, Georgia.[1] Payne negotiated with a Jay Pontiac salesman for the purchase of a new 1997 Pontiac Grand Am automobile and for financing for that purchase. Payne and a representative of Jay Pontiac executed a "Retail Purchase Order."[2] Under the terms of the Retail Purchase Order, Payne agreed to trade in her 1996 Ford Escort, to make a cash down payment *Page 400 
of $1,200 toward the total sales price of $19,769.10, and to finance the balance.
The Retail Purchase Order contains the following provisions on the reverse side:[3]
 "6. The execution of this Retail Buyer's Purchase Order [sic] is an expression of good faith and a contractual obligation on the part of the Buyer [Payne] to purchase the described vehicle (the `vehicle') upon the terms and conditions set forth herein, which becomes binding upon a written acceptance described herein by Dealer [Jay Pontiac]. Dealer agrees to sell the vehicle only under the expressed terms and conditions herein set forth, and upon specific reliance on the representations, certifications and warranties of the Purchaser contained herein.
 "7. This offer is not binding upon Dealer until accepted at Dealer's office and signed by a manager of Dealer, (and until the provisions of paragraph 8 are met if a credit sale), and Purchaser shall have no title or rights in and to the vehicle until acceptance. If the vehicle is left in Purchaser's possession pending acceptance, Purchaser will return it to Dealer in its present condition immediately upon oral demand if this offer is not accepted or if credit is not approved as provided in paragraph 8, and Purchaser shall be responsible for any damages that occur to the vehicle while in Purchaser's possession. If the vehicle is not returned immediately after oral demand, Dealer may take possession of the vehicle without further notice or notification to Purchaser.
 "8. If this is a credit transaction, the Purchaser(s) [sic] offer is not accepted and the transaction is not consummated until (a) approved in writing by Dealer and a responsible Bank or Finance Company, (b) terms of credit are approved by the parties, (c) all disclosures required by the FEDERAL CONSUMER CREDIT PROTECTION ACT (TRUTH IN LENDING ACT) and any other applicable state or federal law and all regulations issued thereunder have been given, (d) Purchaser(s) and Dealer have signed an Installment Sales Contract, (e) full finance disclosure is set forth on Purchaser's copy of any finance contract, and (f) Purchaser has signed a security agreement and other security instrument acceptable to Dealer. In a CREDIT TRANSACTION this is NOT A BINDING CONTRACT unless all required credit disclosures are made to the Purchaser."
(Capitals in original; other emphasis added.) The reverse side of the Retail Purchase Order also includes the following arbitration provision:
 "24. COMMERCIAL ARBITRATION RULES — Any controversy or claim arising out of or relating to this Contract including the making, or breach thereof, shall be settled by arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association, and judgment upon the award rendered by the arbitrator(s) may be entered in any court having jurisdiction."
(Capitals in original.)
Payne also executed a "Retail Installment Sale Contract." Under the terms of the Retail Installment Sale Contract, Payne agreed to finance the balance of the total sales price, minus the amount allowed for her trade-in, the amount of her cash down payment, and the amount of a manufacturer's rebate. Payne testified by affidavit that she waited several hours at Jay Pontiac for credit approval and was finally told by Jay Pontiac that she had been approved and that she could take the new *Page 401 
car home. Payne also testified that Jay Pontiac told her that the sale was final. Jay Pontiac denies telling Payne that her credit application had been approved or that the sale was final.
Before Payne drove the new car home that day, a representative of Jay Pontiac told her that as a condition of the sale she would have to get insurance coverage for the new car immediately.
The next day, March 8, Payne returned to Jay Pontiac and paid Jay Pontiac the $1,200 cash down payment, for which she was given a receipt. Payne testified that a Jay Pontiac salesman told her that in 10 days she would receive the paperwork necessary to obtain a title for the new car. That same day, Payne got insurance coverage. Because she had traded in her old car, she canceled her insurance coverage on that car and stopped making payments on that car. According to Jay Pontiac, it was informed on March 8 that Payne's credit application had been rejected by the finance companies. Payne testified that Jay Pontiac did not inform her while she was at the dealership that day that she had been rejected for credit.
When, after 10 days, Payne still had not received the title paperwork, she telephoned Jay Pontiac to ask why. Payne testified that Jay Pontiac told her her credit was "okay," but that she needed a "cosigner." Payne said she told Jay Pontiac that her mother would co-sign and that she gave Jay Pontiac her mother's name and telephone number. Jay Pontiac checked the credit of Payne's mother, but Payne's mother was not approved.
The new car was damaged while it was parked at Payne's place of work. Payne testified that this damage was covered under the insurance policy she had bought on the new car and that the car was satisfactorily repaired. At some point, the car Payne had traded in was damaged while in Jay Pontiac's possession.
In March 1997, two employees of Jay Pontiac went to Payne's place of work and demanded that she return the new car. Jay Pontiac's president, James Stelzenmuller, testified that the employees had with them both a check for Payne's cash down payment and her old car, both of which they offered to her. Payne denies that the employees brought either a check or her old car, and she states that she refused to return the new car unless her down payment and her old car were returned.
Jay Pontiac contends that after Payne was denied financing, it "made several attempts to have the automobile returned to the dealership by Payne"; however, it says, Payne repeatedly refused to return it. In addition, Jay Pontiac says, it made several unsuccessful attempts to retrieve the automobile from Payne." (Answer Brief of Jay Pontiac to Pet. for Writ of Mandamus at xi.)
In May 1997, Jay Pontiac filed a detinue action pursuant to Ala. Code 1975, § 6-6-250, seeking recovery of the new car, or, in the alternative, damages from Payne in the amount of the sales price of the new car, and compensatory damages for lost use of, and damage to, the new car. Jay Pontiac alleged that it was entitled to immediate possession of the new car, under the terms of the Retail Purchase Order, because Payne had failed to qualify for credit. Jay Pontiac also filed a motion for a writ of seizure related to the new car, together with a supporting affidavit and the required replevin bond. See Ala. Code 1975, § 6-6-250; Rule 64, Ala.R.Civ.P. The trial court granted Jay Pontiac's motion for a writ of seizure and issued the writ. Pursuant to the writ, the Lee County Sheriff's Department seized the new car.
Following the seizure, Payne filed in one document a request for a hearing on the writ of seizure, an answer, and a counterclaim. Payne's counterclaim sought damages based on allegations of breach of contract, fraud, and deceit. A few days later, Payne moved the trial court to set aside the writ of seizure. Jay Pontiac *Page 402 
responded, moving the trial court to release the seized vehicle to Jay Pontiac. Because Payne had failed to post the required statutory bond, the trial court granted Jay Pontiac's motion and ordered the new car released to Jay Pontiac. See Ala. Code 1975, § 6-6-250.
Before the hearing on the issue of dissolution of the writ of seizure, Jay Pontiac filed a motion to compel arbitration of Payne's counterclaims and to stay the proceedings. Jay Pontiac also filed a notice of intent to invoke the law of Georgia. After a hearing on the writ of seizure, the trial court ordered that the writ continue in effect. Thereafter, Payne filed a response in opposition to Jay Pontiac's motion to compel arbitration, and filed an amended counterclaim. In her amended counterclaim, Payne added allegations of suppression and allegations of conversion, both of the new car and of the old one. After conducting a hearing, the trial court granted Jay Pontiac's motion to compel arbitration and ordered that the case be stayed for a period of six months. In February 1998, the trial court ordered Payne to abide by the arbitration provision and to pay the arbitration filing fee. In June, Payne moved the trial court to reconsider its arbitration order. In July, Payne filed a second amended counterclaim, adding allegations of fraud in the inducement in regard to the making of the Retail Purchase Order generally, fraud in the inducement in the making of the arbitration provision specifically, conversion of Payne's cash down payment, and negligence in caring for Payne's old car. After conducting a hearing concerning Payne's motion to reconsider, the trial court denied Payne's motion and set the case for trial on December 7 in the event arbitration was not completed by October 21. The case was set for arbitration on October 19. On October 14, Payne petitioned this Court for mandamus relief and concurrently moved this Court and the trial court to stay the arbitration proceedings. On October 16, the trial court granted Payne's motion and stayed the arbitration proceedings.
 II.
A petition for the writ of mandamus is the proper procedure to challenge a trial court's order granting a motion to compel arbitration. See Ex parte Alexander, 558 So.2d 364, 365 (Ala. 1990). A writ of mandamus is an extraordinary remedy, requiring the showing of: (1) a clear legal right in the petitioner to the order sought; (2) an imperative duty on the respondent to perform, accompanied by a refusal to do so; (3) the lack of another adequate remedy; and (4) the properly invoked jurisdiction of the court. See Ex parte Conference America, Inc., 713 So.2d 953, 955
(Ala. 1998) (citing Ex parte Edgar, 543 So.2d 682, 684 (Ala. 1989)). Mandamus relief is appropriate when a party has been compelled to arbitrate a claim it did not agree to arbitrate. Seeid. The standard of review applicable to a trial court's order compelling arbitration is whether the trial court abused its discretion. See Ex parte McKinney, 515 So.2d 693, 696 (Ala. 1987).
Payne argues that the arbitration provision is unenforceable because Jay Pontiac denies that it has a binding contract with Payne.[4] We agree.
Section 2 of the Federal Arbitration Act, 9 U.S.C. § 2, provides in pertinent part:
 "A written provision in any . . . contract evidencing a transaction involving *Page 403 
commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."
Thus, federal law mandates the arbitration of claims encompassed by an arbitration clause that is a part of a binding contract that involves interstate commerce. See, e.g., AT T Technologies,Inc. v. Communications Workers of America, 475 U.S. 643, 649
(1986). Accordingly, in order for Jay Pontiac to compel arbitration of Payne's counterclaims, the Retail Purchase Order containing the arbitration provision must be a binding contract.
A contract cannot be formed without an offer, an acceptance, consideration, and mutual assent to terms essential to the contract. See Steiger v. Huntsville City Bd. of Educ., 653 So.2d 975,978 (Ala. 1995); see also Ga. Code Ann. § 13-3-1 ("To constitute a valid contract, there must be parties able to contract, a consideration moving to the contract, the assent of the parties to the terms of the contract, and a subject matter upon which the contract can operate.").[5] Paragraph 7 of the Retail Purchase Order provides that Payne's "offer is not binding upon Dealer until accepted at Dealer's office and signed by a manager of Dealer, (and until the provisions of paragraph 8 are met if a credit sale)." Paragraph 8 of the Retail Purchase Order provides in pertinent part that "the Purchaser(s)[sic] offer is not accepted and the transaction is not consummated until (a) approved in writing by Dealer and a responsible Bank or Finance Company." The requirement that a credit sale be approved in writing by a bank or finance company is a condition precedent to the creation of a binding contract.
 "In negotiating a contract the parties may impose any condition precedent, the performance of which is essential before they become bound by the agreement; in other words, there may be a condition precedent to the existence of a contract. Accordingly, where the parties to a proposed contract have agreed that the contract is not to be effective or binding until certain conditions are performed or occur, no binding contract will arise until the conditions specified have occurred or been performed."
17A Am. Jur. 2d Contracts § 34 (1991). It is undisputed that Payne's credit application was not approved. Thus, the condition precedent did not occur, and, by the express terms of the Retail Purchase Order, no binding contract was created.[6] In fact, Jay Pontiac concedes that there is no binding contract: "At no time has Jay Pontiac sought any remedy for breach of contract, but rather it has always taken the position that due to [Payne's] failure to qualify for financing, there was no binding *Page 404 
contractual agreement[,]" and "We believe it significant that Jay Pontiac has never sought damages for breach of contract, but rather has stood by the position that due to Payne's failure to qualify for financing, no contractual agreement existed." (Answer Brief of Jay Pontiac to Pet. for Writ of Mandamus at 12 and 13.) Jay Pontiac cannot seek to enforce the arbitration provision in the Retail Purchase Order and, at the same time, claim that the Retail Purchase Order is not a binding contract. As this Court has recognized, "a person cannot merely pick and choose the provisions in a contract that he wants to apply." Delta Constr. Corp. v.Gooden, 714 So.2d 975, 981 (Ala. 1998).
 III.
Jay Pontiac cannot enforce the arbitration provision, because the Retail Purchase Order is not a binding contract. Payne has demonstrated a clear legal right to the order sought. Accordingly, the trial court is directed to vacate its order compelling Payne to arbitrate her counterclaims against Jay Pontiac.
 WRIT GRANTED.
Hooper, C.J., and Maddox, Houston, Cook, Lyons, Brown, and Johnstone, JJ., concur.
[1] Jay Pontiac is a Georgia corporation.
[2] The identity of the Jay Pontiac representative who signed the Retail Purchase Order and his or her capacity are not reflected in the record.
[3] The Retail Purchase Order is a two-sided, one-page document. The signature line is on the face.
[4] Additionally, Payne argues, among other things, that the arbitration provision is invalid and unenforceable because (1) the contract as a whole was fraudulently induced; (2) the arbitration provision specifically was fraudulently induced; (3) the contract is a contract of adhesion; (4) the arbitration provision lacks mutuality of remedy; (5) there was no mutual assent to the arbitration provision; (6) the contract and the arbitration provision are unconscionable; and (7) Jay Pontiac waived its right to enforce the arbitration provision because it substantially invoked the litigation process. However, because we hold that there was no binding contract, we need not address the merits of these other arguments.
[5] Jay Pontiac argues that Georgia law applies to the facts of this case because the transaction occurred wholly within Georgia. However, Jay Pontiac concedes that under either Georgia law or Alabama law the result would be the same and, indeed, bases its argument on both states' laws. We find that the application of Georgia law would not alter our holding in this case.
[6] Under Georgia law, similarly, there would be no binding contract, because the condition precedent to the existence of the contract was not performed. See Wehunt v. Pritchett, 208 Ga. 441,443, 67 S.E.2d 233, 235 (1951) ("As long as [the buyer] was not bound to buy, the [seller] was not bound to sell. No valid and enforceable contract could arise between the parties until the performance of the condition by the [buyer]. The contract in question shows on its face that it is lacking in mutuality, and that such lack of mutuality can be cured only by a meeting of the condition therein expressed."); see also Ga. Code Ann. § 13-3-4
("A condition precedent must be performed before the contract becomes absolute and obligatory upon the other party."); Moore v.Buiso, 235 Ga. 730, 731, 221 S.E.2d 414, 415 (1975) ("Where a contract is contingent on the meeting of some condition, it is not enforceable by either party until the condition has been met. . . .") (citing, among other cases, Wehunt, supra).