[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 291 
This is an appeal from an order of the Lowndes Circuit Court granting the defendants' motions to compel arbitration; it involves, among other things, the effect of the plaintiffs' alleged mental retardation on their ability to contract. We affirm.
 I. Facts
Charlie Mason, Charlie Thigpen, and others (hereinafter collectively referred to as "the plaintiffs") sued Acceptance Loan Company, Inc., Protective Life Insurance Company, and CNL Insurance America, Inc. (hereinafter collectively referred to as "the defendants"), in the Lowndes Circuit Court, asserting various claims[2] stemming from the solicitation and sale of insurance to the plaintiffs in conjunction with consumer loans they obtained from Acceptance. Specifically, the plaintiffs purchased credit-life and disability insurance from Protective Life and automobile insurance from CNL. The defendants each filed *Page 292 
a motion to compel arbitration, seeking to enforce arbitration agreements signed by the plaintiffs in connection with each consumer loan and each application for insurance. The trial court granted the defendants' motions; this appeal followed.
 II. Analysis
Our analysis is governed by the following now familiar standards:
 "This Court reviews the [grant or] denial of a motion to compel arbitration de novo. Green Tree Fin. Corp. v. Vintson, 753 So.2d 497, 502 (Ala. 1999); Patrick Home Ctr., Inc. v. Karr, 730 So.2d 1171, 1172 (Ala. 1999). The party seeking to compel arbitration has the initial burden of proving the existence of a contract calling for arbitration and proving that the contract evidences a transaction substantially affecting interstate commerce.[3] TranSouth Fin. Corp. v. Bell, 739 So.2d 1110, 1114 (Ala. 1999); Sisters of the Visitation v. Cochran, 775 So.2d 759 (Ala. 2000). '[A]fter a motion to compel arbitration has been made and supported, the burden is on the nonmovant to present evidence that the supposed arbitration agreement is not valid or does not apply to the dispute in question.' Jim Burke Auto., Inc. v. Beavers, 674 So.2d 1260, 1265 n. 1 (opinion on application for rehearing) (Ala. 1995)."
American Gen. Fin., Inc. v. Morton, 812 So.2d 282, 284-85 (Ala. 2001).
It is undisputed that each plaintiff entered into at least one arbitration agreement and that most of the plaintiffs entered into multiple arbitration agreements. There is also no dispute concerning whether the plaintiffs' claims fall within the scope of those agreements. Instead, the plaintiffs contend that the trial court erred in compelling arbitration because, they say, (1) the defendants did not offer sufficient evidence indicating that the transactions substantially affected interstate commerce, (2) the various contracts that contained the arbitration agreements are void under Ala. Code 1975, § 8-1-170, because, they argue, the plaintiffs suffer from mental retardation that renders them "insane," (3) the plaintiffs were fraudulently induced into signing the arbitration agreements, and (4) the arbitration agreements are unconscionable. As discussed below, we find these arguments unpersuasive.
 A. Effect of Transactions on Interstate Commerce
In granting the defendants' motions to compel arbitration, the trial court relied on two uncontroverted affidavits. One of those affidavits was from Leon Michael Schmitt, a vice president of Protective Life. It reads as follows:
 "1. My name is Leon Michael Schmitt. I am over the age of twenty-one (21) years, and have personal knowledge of the following facts:
 "2. I am employed by Protective Life Insurance Company (`Protective') as Vice President, Administration, Financial Institutions Insurance Division. In this capacity I am responsible for all *Page 293 
aspects of credit life insurance sold by Protective.
 "3. I have reviewed the complaint in this case, the Certificate of Insurance issued to the plaintiffs, the `Credit Insurance Disclosure Statement' signed by the plaintiffs and the plaintiffs' policy history. I am familiar with Protective's operating procedures in regard to policies of credit life insurance such as that purchased by the plaintiffs.
 "4. Protective regularly sends and receives policy forms, and other information regarding the type of policy at issue in this lawsuit, across state lines, via the U.S. Mail, faxes, phones and computer/electronic transfer.
 "5. Protective has policyholders throughout the United States, in all fifty states. Protective regularly mails and receives policy forms across state lines.
 "6. When individuals purchase credit life insurance, the policy form and premium payments are remitted across state lines, through the U.S. Mail, to North Carolina.
 "7. In the event a claim is made by any beneficiary not living in North Carolina, all claim forms are mailed by the beneficiary, across state lines, to Protective's office in North Carolina. All examination of the claim is done by an examiner located in North Carolina. The claims examination necessarily entails the transfer of information across state lines via phone lines and the U.S. Mail.
 "8. When a claim is paid, the claim checks are issued in North Carolina and then mailed, across state lines, to the named beneficiary.
 "9. Should any questions regarding the policy arise, policyholders are instructed to contact Protective's North Carolina office, across state lines, using a 1-800 customer service telephone number.
 "10. Protective uses premiums collected on insurance policies to support its interstate activities."
The other affidavit was from Doyle Kelly, president of CNL. It states:
 "My name is Doyle Kelly. I am over 19 years of age and have personal knowledge of the facts and matters contained in this affidavit.
 "I currently serve as President for CNL/Insurance America and have been employed with this company for 27 years. My office is located in Macon, Georgia.
 "I have reviewed the complaint filed by the plaintiffs in this case, and I am familiar with the insurance policies issued by my company relating to the allegations raised by the plaintiffs. Our company issued a master policy to defendant Acceptance Loan Co., Inc. to be used by Acceptance in soliciting Limited Physical Damage insurance in the State of Alabama. Each of the plaintiffs from Alabama would have been issued an insurance certificate from CNL in Georgia. Each of the plaintiff's insurance transactions with CNL would have been an act involving interstate commerce.
 "Attached to my Affidavit as Exhibits . . . are true and correct copies of the arbitration agreements signed by each plaintiff in this proceeding with CNL."[4]
Based on these uncontroverted affidavits, we believe that the plaintiffs' purchase of credit-life and disability insurance and automobile insurance in connection with obtaining loans through Acceptance *Page 294 
clearly "involved" interstate commerce so as to enforce the arbitration agreements under the Federal Arbitration Act, 9 U.S.C. § 1 et seq. ("FAA"). See 9 U.S.C. § 2 (providing that the FAA applies to contracts "evidencing a transaction involving commerce"). Regarding the application of the FAA in the insurance context, we have held:
 "Unquestionably, insurance transactions that stretch across state lines or intrastate insurance transactions that otherwise have the requisite (substantial) effect on interstate commerce constitute `Commerce among the several States,' so as to make them subject to regulation by Congress under the Commerce Clause of the United States Constitution."
Southern United Fire Ins. Co. v. Knight, 736 So.2d 582, 586 (Ala. 1999) (citing United States v. South-Eastern Underwriters Ass'n,322 U.S. 533, 546-47 (1944) (holding that an insurer that conducts business across state lines is engaged in interstate commerce)). See Humana Inc. v. Forsyth, 525 U.S. 299, 307 (1999) (stating that "an insurance company doing business across state lines engages in interstate commerce" (citing South-Eastern Underwriters)).
In this case, Schmitt's affidavit indicates, among other things, that the plaintiffs' Protective Life insurance policies were issued from and are maintained at Protective Life's office in North Carolina. Similarly, Kelly's affidavit indicates that the plaintiffs' CNL insurance policies were issued from and are maintained at CNL's home office in Macon, Georgia.
Furthermore, it is undisputed that the plaintiffs' transactions with Protective Life and CNL were the result of, and, in fact, were an integral part of, the plaintiffs' loan transactions with Acceptance. The insurance was obtained through Acceptance as a part of a transaction in which the plaintiffs' borrowed money from Acceptance.[5] Therefore, because, as stated above, the plaintiffs' transactions with Protective Life and CNL sufficiently "involve" interstate commerce, the transactions with Acceptance must likewise "involve" interstate commerce. See GreenTree Fin. Corp. v. Lewis, 813 So.2d 820, 824 (Ala. 2001) (examining all relevant related transactions to determine whether a particular transaction "involved" interstate commerce).
We affirm the trial court's finding that the defendants met their burden of proving the requisite effect on interstate commerce sufficient to bring the transactions within the provisions of the FAA.
 B. Effect of Evidence of Plaintiffs' Mental Retardation
The plaintiffs' second argument is that, based on evidence indicating that all of the plaintiffs are mentally retarded, all of the contracts between the plaintiffs and the defendants are void under Ala. Code 1975, § 8-1-170, which provides that "all contracts of an insane person are void." The defendants argue that this Court need not decide whether the trial court correctly found this provision inapplicable to the plaintiffs, because the question of the effect of the plaintiffs' alleged mental retardation on the contract is one for an arbitrator, not the court. We disagree.
Generally, a challenge that concerns "`the making of [a] contract in its entirety, rather than just . . . the arbitration agreement itself'" is for an arbitrator, rather than a court, to resolve. NationsBancInvests., Inc. v. Paramore, 736 So.2d 589, *Page 295 
591 (Ala. 1999) (quoting Anniston Lincoln Mercury Dodge v. Conner,720 So.2d 898, 902 (Ala. 1998)). However, a challenge to the very existence of the contract — as is the case when contracts are challenged as being "void" as opposed to "voidable" — is an issue for a court, not an arbitrator, to decide. As we recently explained inJ.C. Bradford Co. v. Vick, 837 So.2d 271, 273 n. 2 (Ala. 2002):
 "When a party is seeking to enforce an arbitration clause, the question whether a valid contract exists between the parties is to be decided by the trial court, not an arbitrator. Lee v. YES of Russellville, Inc., 784 So.2d 1022 (Ala. 2000); Ex parte Payne, [741 So.2d 398 Ala. 1999)] supra; NationsBanc Invs., Inc. v. Paramore, 736 So.2d 589 (Ala. 1999).[2]
 "[2]Our holdings in these cases derive from a decision by the United States Supreme Court. In Prima Paint Corp. v. Flood Conklin Manufacturing Co., 388 U.S. 395 (1967), the United States Supreme Court held that a fraud-in-the-inducement challenge to a contract that contained an arbitration clause should be decided by an arbitrator, and not by a court. However, we follow the reasoning of other courts that limit the holding in Prima Paint Corp. to `voidable' contracts (e.g., a contract where a party is induced through fraud or a contract where a party is an infant). However, where a party challenges the very existence of a contract, that dispute must be decided by a court. See Shearson Lehman Bros. v. Crisp, 646 So.2d 613 (Ala. 1994)."
Therefore, whether the plaintiffs may avail themselves of § 8-1-170
is an issue that was properly addressed by the trial court and that may now be properly addressed by this Court. In addressing this issue, we agree with the trial court that the plaintiffs are not properly characterized as "insane" for purposes of § 8-1-170.
In Shoals Ford, Inc. v. Clardy, 588 So.2d 879, 881 (Ala. 1991), we summarized the law relevant to this issue as follows:
 "The well-settled law in Alabama is that contracts of insane persons are wholly and completely void. See, Williamson v. Matthews, 379 So.2d 1245 (Ala. 1980); Ala. Code 1975, § 8-1-170. In McAlister v. Deatherage, 523 So.2d 387, 388 (Ala. 1988), quoting from Weaver v. Carothers, 228 Ala. 157, 160, 153 So. 201, 202 (1934), this Court explained the cognitive (understanding) test that Alabama adopted in order to determine whether a contract can be avoided because of insanity:
 "`"[To] avoid a contract on the ground of insanity, it must be satisfactorily shown that the party was incapable of transacting the particular business in question. It is not enough that he was the subject of delusions not affecting the subject-matter of the transaction, nor that he was, in other respects, mentally weak. A party cannot avoid a contract, free from fraud or undue influence, on the ground of mental incapacity, unless it can be shown that his insanity . . . was of such character that he had no reasonable perception or understanding of the nature and terms of the contract."'"
(Emphasis added.) The plaintiffs' affidavits indicate that they knew, after having been told, that they were signing "loan papers and insurance papers." The plaintiffs' evidence of "insanity" includes evidence indicating (1) that the plaintiffs' IQ's were low enough that many of them could be classified as "mildly retarded"; (2) that *Page 296 
many of the plaintiffs were illiterate; (3) that the plaintiffs had very limited education, which for some of them included special education classes; and (4) that many of the plaintiffs could not understand legal or business terminology. However, as the trial court correctly held, this evidence is not evidence of "insanity" for purposes § 8-1-170, but is rather, as stated above, evidence of "mental weakness."
Conditions such as illiteracy and a lack of education do not make one "insane" or otherwise deprive one of the ability to contract. SeeJohnnie's Homes, Inc. v. Holt, 790 So.2d 956, 963-64 (Ala. 2001) (holding that evidence indicating that the plaintiff had little education, that he was illiterate, and that he was unaware of the existence of an arbitration provision in a contract did not prove that the provision was unconscionable); Mitchell Nissan, Inc. v. Foster, 775 So.2d 138, 140
(Ala. 2000) (stating that an illiterate person, "if he neglects to have [a document he signs] read, or to enquire as to its contents," cannot, "in the absence of fraud, deceit or misrepresentation, avoid the effect of his signature, because [he is] not informed of its contents. . . ." (emphasis omitted) (quoting Beck Pauli Lithographing Co. v.Houppert, 104 Ala. 503, 506, 16 So. 522, 522 (1894))). Instead, our decisions make clear that one claiming to be "insane" and thereby seeking to void a contract under § 8-1-170 must present evidence of some condition substantially different in nature and degree than mere "mental weakness." For example, in Shoals Ford we affirmed a finding of insanity with regard to an individual, Bobby Joe Clardy, and held that his contract to purchase a truck was void based upon the following facts:
 "According to Ms. Clardy, Bobby Joe had suffered from a manic-depressive disorder for 15 years and was taking lithium to control his condition. She said that she observed in mid-March 1989 that Bobby Joe was becoming manic, but she said that because he was not violent and had not endangered himself or anyone else at that time, she could not involuntarily commit him for treatment. On April 5, 1989, Ms. Clardy received a telephone call from Leslie Clardy Daniel, Ms. Clardy and Bobby Joe's daughter (`the daughter'), concerning Bobby Joe's condition. The daughter told Ms. Clardy that Bobby Joe had threatened her and had obtained $500 from her to make the down payment on a truck he was going to buy from Shoals Ford. Subsequently, Ms. Clardy drove to Shoals Ford and noticed that the truck Bobby Joe had previously looked at, in her presence, was still on the lot. At that time she spoke with a salesperson, and she later telephoned a sales representative with Shoals Ford, concerning Bobby Joe's incompetency and asked that they not allow Bobby Joe to take the truck — that is, she told them that Bobby Joe was not working, that he was ill and would be committed, and that the truck could not be insured. Thereafter, on April 5, 1989, Shoals Ford gave Bobby Joe possession of the truck after he gave it $10,000 as the down payment. Ford Motor Credit Company eventually repossessed and sold the truck and mailed Ms. Clardy a check for $3,284.98, which left a balance of $6,715.02 of the $10,000 down payment unrecovered by Ms. Clardy.
 "According to the daughter, when Bobby Joe visited her around April 1, 1989, she tried to get him to resume taking his medicine. He became agitated and went out of control, threw his medicine into a burning pile of leaves, and then left. Around 5 A.M. on April 5, 1989, Bobby Joe returned to the daughter's house, banged on the doors and windows until he awakened the *Page 297 
household, threatened their lives, and forced the daughter to write him a check for $500. When he left, the daughter telephoned 911 to report the incident and, as soon as the probate office opened, she telephoned the probate judge to inform him of the situation. She then went to her attorney's office, explained the situation to him, and asked that he prepare a petition to have Bobby Joe involuntarily committed for treatment. While in her attorney's office, she notified the bank to stop payment on the $500 check she had written to Bobby Joe and then called to notify Shoals Ford of Bobby Joe's mental condition, telling a representative that Bobby Joe would be coming in to purchase a truck, specifically describing the particular truck; telling the representative that Bobby Joe was not healthy; and telling the representative that she had filed a petition to have Bobby Joe involuntarily committed. She also asked Shoals Ford to call the Lauderdale County sheriff, a family member, her attorney, Riverbend Center for Mental Health, or the probate office for verification in the event Bobby Joe did appear at the dealership. She further explained to the representative that `buying sprees' was a symptom of Bobby Joe's illness, that he would not be able to make the payments, and that he was not insurable. When she notified Shoals Ford of the situation, it merely stated that if Bobby Joe had the money to purchase the truck, it was `none of her concern.' Around 10 A.M. on April 5, 1989, she drove by Shoals Ford and, noticing that the truck was still there, she once again telephoned `to plead' with Shoals Ford to notify her when Bobby Joe arrived. At this time, the representative told her that `it was really not of concern to Shoals Ford.'
 "According to Dr. Joseph W. Glaister, a local psychiatrist who had treated Bobby Joe since 1984, Bobby Joe suffered from a manic depressive illness, manic type, recurrent. Dr. Glaister testified that Bobby Joe's illness was episodic, that his competency could come and go, and that there were stages of the illness when, on mere observation, one might think that Bobby Joe was a slightly excessive, overly friendly individual. He further testified that Bobby Joe had been admitted to the hospital after regular working hours on April 5, 1989, and that when he saw Bobby Joe on April 6, 1989, Bobby Joe was incompetent. Furthermore, according to the testimony of Dr. Glaister, he could not visualize Bobby Joe being otherwise on April 5, 1989.
 "The daughter's attorney testified that he remembered the events of April 5, 1989, when the daughter contacted him, when he obtained a history of the events of the day, and when he prepared the commitment petition and other documents that were filed with the probate court on that morning. He stated that he did not prepare and file the petition to appoint Ms. Clardy as conservator and limited guardian for Bobby Joe until a month after the petition to commit, because Bobby Joe was hospitalized during that period of time and, in the attorney's opinion, had no opportunity to dissipate his estate.
 "Based on the foregoing, we hold that there was sufficient evidence to support the jury's verdict that during the period in question — from April 1, 1989 (when Bobby Joe began negotiations to purchase the truck), to April 3, 1989 (when Shoals Ford alleges the transaction was completed), to April 5, 1989 (when Ms. Clardy alleges the transaction was completed) — Bobby Joe was incompetent; that during that period of time, he was incapable of understanding and *Page 298 
appreciating the nature, terms, and effect of the contract."
Shoals Ford, 588 So.2d at 881-83 (footnote omitted).
Further, in McAlister v. Deatherage, 523 So.2d 387 (Ala. 1988), we found the following evidence of the insanity of the plaintiff, McAlister, sufficient to preclude a summary judgment for the defendants:[6]
 "McAlister was diagnosed as having bipolar disorder (manic-depression) at least as far back as 1967, when the military service declared him to be 100 percent disabled. Since that time he has not worked, living entirely off Veterans Administration benefits and social security benefits. McAlister began seeing Dr. Lopez in 1975 and was treated by Dr. Lopez until McAlister moved to North Alabama and began treatment with Dr. Phillips in November 1985. During McAlister's treatment under Dr. Lopez, he was committed at least once through the probate court to a mental hospital and was, for the vast majority of that time, on various medications, including Lithium, to help control his illness. Three days before the contract to buy the house was signed, Dr. Lopez had a meeting with McAlister. Dr. Lopez was of the opinion that at that time McAlister was off his medication and `was psychotic. And, when he is psychotic, . . . it is a major psychiatric disorder of psychotic proportions.' Lopez also stated that such episodes last weeks at a time and that even with `intensive treatment at a psychiatric hospital,' the manic episode may be shortened only to `two or three weeks.' McAlister testified that during the early part of July 1985 he was hospitalized to undergo a gall bladder operation, during which time none of his medication for his illness was administered to him by the hospital. According to McAlister, he remembers only bits and pieces over the next two months (from mid-July to late-September or early October). McAlister stated in his deposition that he remembered nothing about any financial statements he may have signed and did not know what, if any, other documents he had signed during that time. Most of what McAlister does remember is through what third persons have recently told him.
 "The very nature of the manic-depressive, as stated in Dr. Phillips's deposition, is often characterized by `buying sprees, frequently buying things that they don't need and often charging or writing checks for which they have no funds to finance.' This is not to say that all manic-depressives may be classified as insane within the cognitive test that Alabama utilizes. However, under this set of facts and in this circumstance, we cannot say that McAlister `had sufficient capacity to understand in a reasonable manner the nature and effect of the act which he was doing,' Hall v. Britton, [216 Ala. 265, 113 So. 238
(1927)], or that he had a `reasonable perception or understanding of the nature and terms of the contract.' Weaver v. Carothers, [228 Ala. 157, 153 So. 201
(1934)]. Taking the depositions and affidavits submitted on behalf of McAlister as true, we find that, in light of the scintilla rule, summary judgment for the Deatherages was inappropriate. We therefore reverse and remand as to them."
McAlister, 523 So.2d at 388-89.
Likewise, in Weaver v. Carothers, 228 Ala. 157, 153 So. 201 (1934), we upheld a *Page 299 
finding of insanity with regard to a defendant debtor, Carothers, who had acquired certain contractual liabilities:
 "[P]hysicians have testified in their opinion that this defendant, William Carothers is insane. There does not appear any good reason for the Court to review the testimony of these witnesses. The Court will mention the testimony of one of these witnesses. This evidence was taken on the 2nd day of May, 1932. It is the testimony of Dr. L. Hays. This physician says he has known the defendant for a long period of time; that he has seen him frequently, and had conversations with him and there is other intimacy with the defendant shown by his testimony. This physician states he was a person in his opinion of unsound mind, and in addition to his opinion he states that the defendant was suffering from a mental affliction; that he has hydrocephalus; that it was a condition that existed from his birth, and that it caused him to be mentally deficient. The term hydrocephalus is a disease recognized by medicine; it causes its victim to be mentally deficient, and often idiotic; it is a lesion of the brain — an affection of the very substance of the brain. This testimony is not disputed by any one. The Court is, therefore, of the opinion that the defendants have shown by the evidence that William Carothers is suffering from mental imbecility to such a degree as to void his contracts, and that he was so suffering at the time the contracts sued on were made."
228 Ala. at 159, 153 So. at 202.
When compared to the evidence involved in those cases, it is clear that the evidence proffered by the plaintiffs in this case does not establish that the plaintiffs were "insane," so as to void their contracts under § 8-1-170. Not only does the evidence support a finding only of mere "mental weakness" as stated above, but the plaintiffs "insanity" argument is also undermined further by evidence indicating that the plaintiffs had repeated transactions with the defendants before the transactions at issue. In sum, we conclude that the trial court correctly rejected the plaintiffs' "insanity" argument.
 C. Fraudulent Inducement
The plaintiffs also assert that they were fraudulently induced to sign the contracts containing the arbitration agreements because, they say, when the plaintiffs asked the defendants what they were signing, the defendants told them only that the documents were "loan papers and insurance papers"; they also told the plaintiffs what their payment amounts were and the amounts they were borrowing, but did not specifically mention the arbitration agreement. Because there is no dispute that the arbitration provisions were clearly (and repeatedly) indicated in the various documents signed and received by the plaintiffs, the plaintiffs' claim of fraudulent inducement essentially rests on a combination of this alleged failure to disclose and the plaintiffs' alleged inability to read and to understand the documents at issue.
However, unlike their insanity claim, the plaintiffs' fraudulent-inducement claim should be resolved by an arbitrator, not a court. This conclusion is compelled by our decision in Anniston LincolnMercury Dodge v. Conner, 720 So.2d 898, 902 (Ala. 1998), which concerned a virtually identical argument:
 "We conclude that Conner's claim goes to the making of the contract in its entirety, rather than just to the arbitration clause itself. The facts of this case are similar to those addressed by the United States Court of Appeals for the Fifth Circuit in Villa *Page 300 Garcia v. Merrill Lynch, Pierce, Fenner Smith, Inc., 833 F.2d 545 (5th Cir. 1987). In Villa Garcia, an investor sued a brokerage firm and several employees, alleging violations of the Securities Exchange Act of 1934. The defendants moved to compel arbitration, based on an arbitration agreement contained in the overall contract signed by the investor. The investor argued, in part, that the arbitration provision in the contract was unenforceable because of his inability to read English, which he said prevented his reading and understanding the contract. The court rejected this argument, stating that '[t]hese alleged facts and the overreaching claim they assertedly support should "be decided by an arbitrator, not the district court, since they go to the formation of the entire [contract] rather than" to the formation of the arbitration provision.' Id. at 548 (citations omitted).
 "Likewise, in this case, Conner's allegation addresses the contract as a whole, rather than the arbitration provision itself. Conner has not alleged that ALMD [Anniston Lincoln Mercury Dodge] treated the arbitration clause differently from the way it treated any other provision of the contract; instead, she has merely argued that the arbitration clause was fraudulently induced because ALMD, she says, failed to disclose the existence of that clause. That argument, it seems, is similar to the one advanced in the Villa Garcia case. That argument, in fact, if valid, could apply equally to virtually all of the other provisions of the contract. Cf. Doctor's Associates, Inc. v. Casarotto, 517 U.S. 681, 116 S.Ct. 1652, 134 L.Ed.2d 902 (1996) (arbitration agreements must be given treatment equal to that given to other agreements).
 "Based on the foregoing, and based on our conclusion that Conner's allegation that she was unable to understand English bears upon the entire agreement, we hold that the trial court should not have decided whether Conner had agreed to the arbitration agreement; instead, that question, if presented, should have been answered by an arbitrator."
(Emphasis added.)
The plaintiffs' argument that their fraudulent-inducement claim relates only to the arbitration clause is unpersuasive. That claim, if valid, could be used to challenge any particular provision in the contracts that was not specifically mentioned or discussed with a plaintiff. SeeAnniston Lincoln Mercury Dodge, 720 So.2d at 901-02 ("Although Conner alleges that she has challenged the making of the arbitration agreement itself, we must look beyond the ad hoc arguments of counsel in order to determine whether her claim actually bears upon the entire agreement and upon the activities of the parties in general."). Therefore, the plaintiffs' fraudulent-inducement claim should be resolved by an arbitrator, not by a court.
 D. Unconscionability
The plaintiffs also contend that the arbitration agreements are unconscionable, a contention the plaintiffs have the burden of demonstrating by substantial evidence. Vann v. First Cmty. Credit Corp.,834 So.2d 751, 754 (Ala. 2002); Conseco Fin. Corp. — Alabama v.Boone, 838 So.2d 370, 373 (Ala. 2002). To accomplish this, the plaintiffs rely primarily on American General Finance, Inc. v. Branch, 793 So.2d 738
(Ala. 2000). In that case, we held unconscionable an arbitration agreement that we determined (1) was "unusually broad in scope and application," 793 So.2d at 748; (2) "invest[ed] the arbitrator with the threshold issues of arbitrability," id. at 749; (3) exempted the defendant money lenders from any duty to arbitrate and reserved for them "the right to try to a jury their claims against [the plaintiff] up *Page 301 
to $10,000," id. at 749; (4) limited "the right of the arbitrator to award an amount `exceed[ing] five times the amount of economic loss,'"id. at 749; and (5) was signed by a plaintiff who had "no meaningful choice," id. at 751, that is, she signed the agreement at a time when "the market was virtually closed to consumers seeking comparable financing without agreeing to arbitration provisions." Id. at 750. Based upon these facts, we held that the agreement in that case was unconscionable because it had "(1) terms that are grossly favorable to [the defendant, which had] (2) overwhelming bargaining power."[7] Id.
at 748.
The plaintiffs in this case claim that the facts surrounding the arbitration agreements they signed are similar to, and compel the same result as, the facts surrounding the agreement declared unconscionable inBranch. The plaintiffs argue that this conclusion is supported by the presence of (1) a lack of meaningful choice on their part; (2) a lack of mutuality of remedy; and, although not a factor mentioned in Branch, (3) an inherent bias on the part of the American Arbitration Association. However, we find these assertions either unsupported or unpersuasive.
First, the plaintiffs have not produced sufficient evidence indicating that they had "no meaningful choice." Instead, the plaintiffs merely assert that "[s]imilar [market] circumstances [to those in Branch] exist in the case at hand," (Plaintiffs' brief at 28, without citation to any evidence in the record indicating that the plaintiffs were "unable to acquire [the loans and insurance without signing an arbitration agreement] without considerable expenditure of time and resources."Branch, 793 So.2d at 751.[8]) In this respect, the plaintiffs have not met their burden of proof. See Boone, 838 So.2d at 373 (stating that "'[Boone has] made no showing that she lacked a meaningful choice in obtaining financing'" (quoting Green Tree Fin. Corp. v. Lewis, 813 So.2d at 825)); Vann, 834 So.2d at 754 (upholding an arbitration agreement in favor of a defendant lender where, among other things, the plaintiffs failed to present evidence indicating that "they were unable to find an alternate lender or that the [automobile] dealer required them to use [the defendant lender]").
Second, the plaintiffs note that the arbitration agreements do not expressly require the defendants to arbitrate claims they might bring against the plaintiffs, a characteristic similar to the agreement inBranch. 793 So.2d at 749. While relevant to any unconscionability analysis, this characteristic cannot alone be determinative; it is but one factor to be considered. Vann, 793 So.2d at 749 (stating that "the lack of mutuality of remedy, alone, is not *Page 302 
sufficient to support a claim of unconscionability"); Branch, 793 So.2d at 744 (stating that "`the lack of mutuality of remedy can be one factor, along with others, that a court may consider in determining whether an arbitration clause is unconscionable'" (emphasis omitted) (quoting Ex parte Parker, 730 So.2d 168, 171 (Ala. 1999))).
And, unlike the factual scenario in Branch, the effect of any lack of mutuality of remedy in this case is tempered by the absence of any limitations on what damages an arbitrator can assess against the defendants. See Branch, 793 So.2d at 749 (stating that the lack of mutuality of remedy was made "particularly significant" in light of the provision limiting damages that can be awarded by an arbitrator).[9]
Third, without citing any evidence in the record, the plaintiffs assert that the American Arbitration Association — the entity whose rules would govern any arbitration between the parties — would be inherently biased in favor of the defendants. This totally unsupported assertion is purely speculative in nature, and we need not consider it further.[10]
In sum, the plaintiffs have failed to produce sufficient evidence of unconscionability with regard to the arbitration agreements.
 III. Conclusion
Based on the above, we affirm the trial court's order granting the defendants' motions to compel arbitration.
1010563 — AFFIRMED.
1010564 — AFFIRMED.
See, Lyons, Brown, Harwood, Woodall, and Stuart, JJ., concur.
Moore, C.J., dissents.
[2] The plaintiffs asserted claims of fraudulent misrepresentation; innocent, reckless, negligent, or wanton misrepresentation; concealment; suppression; and negligence and wantonness. Additionally, the plaintiffs alleged that Protective Life and CNL had colluded and conspired with Acceptance to commit fraud in soliciting and selling credit-life and disability insurance.
[3] The defendants challenge the requirement as enunciated in Sistersof the Visitation v. Cochran Plastering Co., 775 So.2d 759 (Ala. 2000), that an individual contract or transaction must itself "substantially effect" interstate commerce, arguing that, to the extent that the "substantial-effect" standard relies upon United States v. Lopez,514 U.S. 549 (1995) — a case involving, as the defendants posit, a challenge to the constitutionality of a federal statute rather than the issue whether a federal statute reaches an individual transaction — such reliance is misplaced. However, given our holding in this case, we do not accept the defendants' invitation to reexamine theSisters of the Visitation rationale.
[4] The exhibits attached to Kelly's affidavit specifically indicate that CNL's home office is in Macon, Georgia; those exhibits are not attached to this opinion.
[5] Accordingly, Acceptance is listed on the Protective Life policies as the "Creditor/First Beneficiary" and is the "Lender (Named Insured)" on the CNL policies.
[6] McAlister was decided under the "scintilla rule," which was statutorily abrogated in 1987 and replaced by the substantial-evidence rule. See Ala. Code 1975, § 12-21-12. However, it is the substance of the evidence that is important in the present analysis.
[7] This two-part test was the Branch Court's summarization of our established — and still applicable — four-part test of unconscionability expressed in Layne v. Garner, 612 So.2d 404, 408 (Ala. 1992):
 "(1) whether there was an absence of meaningful choice on one party's part, (2) whether the contractual terms are unreasonably favorable to one party, (3) whether there was unequal bargaining power among the parties, and (4) whether there were oppressive, one-sided or patently unfair terms in the contract."
[8] A lack of this type of evidence was precisely the reason we reversed the trial court's judgment based on its finding of unconscionability with respect to a second plaintiff in Branch. SeeBranch, 793 So.2d at 751-52. We reached this result even though the second plaintiff's arbitration agreement was identical to the one held unconscionable with respect to the first plaintiff, who did produce substantial evidence of a lack of a true meaningful choice. Id.
[9] The plaintiffs also argue that their poor reading skills and lack of education, and the defendants' alleged knowledge of those limitations, render the arbitration agreement unconscionable. However, as discussed above, we have repeatedly held to the contrary. See Johnnie'sHomes, Inc., supra, 790 So.2d at 963-64; Mitchell Nissan, Inc., supra, 775 So.2d at 140.
[10] The plaintiffs do not address the fact that one of the arbitration agreements provides that "[t]he arbitration panel shall consist of three (3) arbitrators, one (1) selected by the company, one (1) selected by the claimant, and one (1) selected by the arbitrators previously selected." Furthermore, they ignore the fact that under the FAA, the actions of a biased, partial arbitrator can be reviewed by a court:
 "(a) In any of the following cases the United States court in and for the district wherein the award was made may make an order vacating the award upon the application of any party to the arbitration —
 "(1) where the award was procured by corruption, fraud, or undue means;
 "(2) where there was evident partiality or corruption in the arbitrators, or either of them;
 "(3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or
 "(4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made."
9 U.S.C. § 10(a) (emphasis added). *Page 303